DAN BUCHANAN v. CRANBERRY FURNACE COMPANY.

(Filed 10 December, 1919.)

1. **Employer and Employee—Master and Servant—Safe Place to Work— Inspection.**

    The employee does not assume the risk of dangers as being inherent in the class of services he is to perform when the injury received by him was caused by the negligence of his employer in performing his duty to furnish a reasonably safe place to work, of which dangers the employer knew, or should have known by reasonable inspection, and of which the employee was unaware, and was not reasonably presumed to have known.

2. **Same—Negligence—Master's Relative Duty—Dangerous Employment— Assumption of Risks—Evidence—Questions for Jury—Trials.**

    The duty owed by the owner of a mine to his employee, a "mucker," working in a tunnel thereof, to furnish him a reasonably safe place to work and to keep it so by proper inspection, is a primary one; and where, under the rules of a mine, such employee was not permitted to enter the tunnel after a blast, until it had been inspected and "scaled," to prevent injuries from rocks jarred by the explosion and likely to fall, and there was evidence that either during the inspection, or thereafter, the defendant, and others under the direction of vice principals, entered the tunnel, and was injured by a falling rock, the danger of which had immediately been discovered by another employee who had been sent for a torch; and there was conflicting evidence as to whether such employee was warned or heard the warning given of the danger, not to him but to others, or went forward with his work upon being instructed to do so, and received the injury in consequence: *Held*, sufficient evidence for the determination of the jury upon question of the defendant's actionable negligence, and also as to the employee's assumption of risk, and was properly submitted to the jury instead of being decided as a matter of law.

3. **Employer and Employee—Master and Servant—Safe Place to Work— Negligence—Nondelegable Duty.**

    The employer may not delegate to another his duty to furnish his employee with a reasonably safe place to work and to maintain it so by reasonable inspection, and escape liability for an injury caused his employee by neglect of this duty by the person acting for him.

4. **Appeal and Error—Instructions—Correct in Part.**

    Exceptions to the judge's charge will not be sustained on appeal when it includes a portion thereof that is correct.

5. **Appeal and Error—Instructions—Contentions—Objections and Exceptions.**

    An erroneous statement of the appellant's contentions in the instructions of the court to the jury must be called to the attention of the judge, at the time, so as to afford him an opportunity to correct it, and if this is not done it will not be considered on appeal upon an exception thereafter taken.

6. **Appeal and Error—Instructions—Special Requests—Objections and Exceptions.**

Exceptions that the instructions of the court to the jury were not suffi-
ciently full and explicit will not be considered on appeal. If the appellant
desired any particular phase of the case to be presented to the jury, he
should have requested a special instruction presenting it.

**7. Appeal and Error—Instructions—Indefiniteness.**

An instruction will not be held as error, for indefiniteness, when it ap-
pears, in connection with the charge and the evidence, that the jury must
have fully understood it.

CIVIL ACTION, tried before *Long, J.,* and a jury, at July Term, 1919,
of AVERY.

Plaintiff alleged that he was employed by defendant as a "mucker"
in its mine, and was seriously injured by the falling of a rock in the
mine, which struck his muck, or dump car, near which he was standing,
while engaged in his work, and upset the same, lifting it on one of its
ends, and that the car then fell on him and broke his leg.

Plaintiff and Ed. Hughes were working in the mine together as muck-
ers. They had taken in a car the morning that plaintiff was injured,
loaded, and it was rolled out of the mine by gravity, then returned to
the mine. When they reached the place where they were to reload, they
were told to scotch the muck car and wait until the scaling was finished.
These hands were subject to the orders of George Tolley, who was fore-
man, Monnie McCoury was walking boss, who controlled the foreman,
and Rube Cook was scaling boss. All of them were superiors of plain-
tiff, and gave him orders. Plaintiff had worked that morning in safety
at the place where the rock fell on him. Rube Cook was scaling a part
of the roof, but there was evidence that the rock fell at a place which had
already been scaled. While they were scaling, Ed. Hughes was ordered
to come up and hold the light, which he did, not using his own, but
another lamp, and while standing there, he said: "There is a rock I do
not like the looks of." Rube Cooke punched the rock and it fell. It
struck the plaintiff's car, standing it on end, and the car then fell on
plaintiff's leg, which was broken by the fall and seriously injured. The
plaintiff was standing about five feet from the car when it struck him.
He testified that he did not hear any one of them say to the other men,
"Might not this rock hit the car," nor did he hear any one say, "You had
better get away; might not this rock fall?" and nothing was said about
the rock that he heard. He further stated that Mr. Cook was the scale
boss, and that he did not tell them to "get out of the way," but merely
said, "Watch out boys, they are scaling," and he knew what it meant, and
got out of the way. He heard some one say, "All right, boys," while he
was standing near the car, before the rock fell. Ed. Hughes testified:

"The rock that fell was not the one we prized out; Rube and I had
pulled rocks all down to this rock, but had not followed down far enough

to discern it. That was a portion of the mine that had been scaled earlier; they had scaled down and left this rock. That portion of the mine over this car had been scaled earlier in the morning; we had worked over that; we worked under that the first time. I do not know how long I have worked with Dan; not very long; Dan was as good a hand as I ever met with on Cranberry; would come as near doing what he had to do as I ever found. I am not still working at that mine; I have not worked there since last February, this year."

There was much more evidence of a like kind.

The defendant did not introduce any evidence, but at the close of plaintiff's testimony it asked for a nonsuit, which was refused, and it excepted.

Defendant also asked for the following instructions:

"1. If the jury find from the evidence the facts to be as testified to by the plaintiff, the plaintiff is guilty of contributory negligence, and you should answer the second issue 'Yes.'

"2. If you find from the greater weight of the evidence that the plaintiff came from a place of safety and stood by and looked at the scalers scale the wall out of curiosity, and could realize the danger as well as those engaged in the scaling, then the court charges you that this would constitute contributory negligence, and you will answer the second issue 'Yes.' "

The first of these instructions was refused, and the second was modified, as follows: "Nothing else appearing, the court gives you that instruction, as prayed by the defendant; that is to say, if you find the facts as contended for by the defendant, I give you the instruction as prayed."

The jury returned a verdict finding plaintiff was injured by the defendant's negligence; that there was no contributory negligence, and assessed the damages. Judgment, and appeal by defendant.

*Charles E. Greene, W. C. Newland, and S. J. Ervin for plaintiff.*

*J. H. Epps, J. P. Johnston, F. A. Linney, and Merrimon, Adams & Johnston for defendant.*

WALKER, J., after stating the facts as above: It is apparent, from the argument of this case, that the real question is as to the precise duty which the defendant owed to the plaintiff, with respect to the safety of defendant while at his work, and the duty owing by the defendant to himself. It is contended by the defendant's counsel that the master is not required to furnish a safe place for his servant to perform his work, and this is true, in the sense that he does not insure the safety of his servant. The true measure of the master's duty and obligation to his servant has been repeatedly stated by this Court, and corresponds exactly with what it is declared to be in the authorities cited by the defendant

from other jurisdictions. We will refer to one or two of them. Take the case of *Zeigemeyer v. Cement Co.,* 88 S. W. (Mo.), 139-141, for example; the Court held there that the rule as to a safe place is not applicable to every state of facts, nor is the principle pertinent in every case, it having one well defined and fully established exception, which is, that the master is not required to furnish a safe place in which his servant is to work where danger constantly arises from the inherent hazard and progress of the work itself, or is incident to it, and is known to the servant. When the principle, as thus stated by that learned Court, is confined within its proper limits, and is correctly applied to the facts of the particular case, there is no fault to be found with it. We have had cases in this Court where we ruled substantially to the same effect, but they are based upon the reason that the master has no sufficient opportunity to discover the defect in the machinery, or the danger of the place, for the work, and the servant can just as easily see the danger when it appears as the master, and is aware that it is likely to arise at any time, it being an incident of the particular work in which he is engaged. The same may be said of other propositions, on which the defendant relies, and for which he cites *Thompson v. California Con. Co.,* 82 Pac., 386, where it is held that the master is not an insurer of his servant's safety, and that his duty to furnish him with a safe place to work is not an absolute one, but the obligation is performed when he exercises ordinary care to provide a reasonably safe place in which to do the work.

We undertook, in *Mincey v. R. R.,* 161 N. C., 467, at 470-471, to state the rule with respect to both tools and appliances to be used by the servant, and place to work, as follows: "The duty of the master to provide reasonably safe tools, machinery, and place to work does not go to the extent of a guarantee of safety to the employee, but does require that reasonable care and precaution be taken to secure safety, and this obligation, which is positive and primary, cannot be avoided by a delegation of it to others for its performance. The master's duty, though, is discharged if he does exercise reasonable care in furnishing suitable and adequate machinery and apparatus to the servant, with a reasonably safe place and structures in and about which to perform the work, and in keeping and maintaining them in such condition as to afford reasonable protection to the servant against injury. *R. R. v. Herbert,* 116 U. S., 642; *Gardner v. R. R.,* 150 U. S., 349; *R. R. v. Bough,* 149 U. S., 368; *Steamship Co. v. Merchant,* 133 U. S., 375. This undertaking on the part of the master is implied from the contract of hiring (*Hough v. R. R.,* 100 U. S., 213), and if he fails in the duty of precaution and care, he is responsible for an injury caused by a defect which is known to him and is unknown to the servant. *R. R. v. McDade,* 135 U. S., 554. These principles are fully supported by the following cases in this Court,

and apply to machinery and tools or implements of simple as well as complicated construction. *Twiddy v. Lumber Co.,* 154 N. C., 237; *Reid v. Rees,* 155 N. C., 230 (ladder case); *Orr v. Tel. Co.,* 130 N. C., 627 (*S. c.,* on rehearing, 132 N. C., 691); *Avery v. Lumber Co.,* 146 N. C., 595; *Cotton v. R. R.,* 149 N. C., 227; *Marks v. Cotton Mills,* 135 N. C., 287; *West v. Tanning Co.,* 154 N. C., 44; *Nail v. Brown,* 150 N. C., 533, and *Mercer v. R. R.,* 154 N. C., 399 (hammer case), opinion by *Justice Allen,* in which it is held that the duty of inspection of tools and appliances does not extend to those of simple construction, such as hammers, chisels, axes, and others of like kind, where the employee is assumed to have equal knowledge and ability with the master for discovering the defect, if any. He is required to use it, and, therefore, is in a better situation to discover the imperfection of the implement and report it to the master for repair or the substitution of a new one."

After referring to the distinction as to small tools or implements, we further said: "This relaxation of the rule can have no application to a defect of which the master is actually cognizant, and which, as a reasonable man, he should appreciate is likely to result in injury to one using the implement as it is likely to be used, and which is neither known to the employee nor of such a character as to be apparent from the observation which may be expected to accompany its use. In such case the general rule of negligence is fully effective, and the master who knowingly and negligently exposes the employee to a peril unknown to the latter must respond for the damage which results."

We stated the same rule substantially in *Marks v. Cotton Mills, supra,* where it was said: "The employer does not guarantee the safety of his employees. He is not bound to furnish them an absolutely safe place to work in, but is required simply to use reasonable care and prudence in providing such a place. . . . He meets the requirements of the law . . . if he uses that degree of care which a man of ordinary prudence would use, having regard to his own safety. . . . It is the negligence of the employer in not providing for his employees safe machinery and a reasonably safe place in which to work that renders him liable for any resulting injury to them. . . . The rule which calls for the care of the prudent man is in such cases the best and safest one for adoption. It is perfectly just to the employee and not unfair to his employer, and is but the outgrowth of the elementary principle that the employee, with certain statutory exceptions, assumes the ordinary risks and perils of the service in which he is engaged, but not the risk of his employer's negligence. When any injury to him results from one of the ordinary risks or perils of the service, it is the misfortune of the employee, and he must bear the loss, it being *damnum absque injuria;* but the employer must take care that ordinary risks and perils of the em-

ployment are not increased by reason of any omission on his part to provide for the safety of his employees. To the extent that he fails in this plain duty he must answer to his employee for any injuries the latter may sustain which are proximately caused by his negligence."

The above cases, decided by this ourt, will be found, when properly considered, not to be at variance with any of those relied on by the defendant.

It has been held by this Court, and others, that the duty of providing a reasonably safe place where the servant may do his work is a primary and nondelegable one of the master, and is illustrated with respect to mines by the case of *Western Const. & Mining Co. v. Ingraham,* 70 Fed., 219, where it is held to be a positive duty which the owner of a mine owes to his servants, after the mine is opened and timbered, to use reasonable care and diligence to see that the timbers are properly set, and to keep them in proper condition and repair, and for this purpose to provide a competent mining boss or foreman, to make timely inspections of the timbers, walls, and roof of the mine. It is an absolute duty, which the master owes his servant, to exercise reasonable care and diligence to provide the servant with a reasonably safe place to work, having regard to the kind of work and the conditions under which it must necessarily be performed; and when the master, instead of performing this duty in person, delegates it to a servant, then such servant stands in the place of the master, and his negligence is the negligence of the master. The case cites many authorities to the same effect, and among them *Railway Co. v. Jarvi,* 10 U. S. App., 344 (3 C. C. A., 433, and 53 Fed. Rep., 65), where it is said, with reference to work in mines and the duty of the owner to his employees: "It is the duty of the employer to exercise ordinary care to provide a reasonably safe place in which his employee may perform his service. It is his duty to use diligence to keep this place in a reasonably safe condition, so that his servant may not be exposed to unnecessary and unreasonable risks. The care and diligence required of the master is such as a reasonably prudent man would exercise under like circumstances in order to protect his servants from injury. It must be commensurate with the character of the service required, and with the dangers that a reasonably prudent man would apprehend under the circumstances of each particular case. Obviously, a far higher degree of care and diligence is demanded of the master who places his servant at work digging coal beneath overhanging masses of rock and earth in a mine than of him who places his employee on the surface of the earth, where danger from superincumbent masses is not to be apprehended. A reasonably prudent man would exercise greater care and watchfulness in the former than in the latter case, and, throughout all the varied occupations of mankind, the greater the danger that a reason-

ably intelligent and prudent man would apprehend, the higher is the degree of care and diligence the law requires of the master in the protection of the servant. For a failure to exercise this care, resulting in the injury of the employee, the employer is liable; and this duty and liability extend, not only to the unreasonable and unnecessary risks that are known to the employer, but to such as a reasonably prudent man in the exercise of ordinary diligence—diligence proportionate to the occasion—would have known and apprehended."

The danger, in our case, arose from the explosions or blasts which were calculated to loosen the dirt and rock in the sides and roof, and not from mere natural causes. And in this connection the case of *Every v. Rains,* 84 Kansas, 560, is a very instructive one. There it was held that it is not necessary that the master should have actual knowledge of the defective condition of a roof in a mine in order to be liable for a personal injury to an employee by the falling of a fragment therefrom, if in the exercise of reasonable care the defect would have been known and the resulting injury avoided. To ascertain the condition of the roof in a drift of a lead-and-zinc mine, the operators of the mine adopted the use of a prod, consisting of a piece of gas pipe, to test the roof and dislodge loose pieces therefrom. Whether the instrument made use of and the method and frequency of its use satisfied the requirement of reasonable care on the part of the master to make the place safe for the servants was, under the evidence, a question of fact for a jury. The contention of the defendants that the evidence and findings of the jury require the court to hold, as matter of law, that the injured employee assumed the risk of the danger by which he lost his life is not sustained. The Court further said: "It was the duty of the appellee to use reasonable care to put the bank in a condition and keep it in a condition which would render the operation of cars on the car track reasonably safe from all caving naturally to be anticipated in consequence of the steam shovel's work; and this duty required that the bank be inspected with the care and frequency which reasonable prudence demanded, under all the conditions presented," citing *Griffin v. Brick Co.,* 84 Kan., at p. 347. Both cases have features in common with this one. The mines were constructed in practically the same way, and the operations were similarly conducted. There were cars run by gravity one way, and the plaintiffs were hurt by rocks falling from the roof. The mines were operated by explosives, which loosened the clay and rock. Any defect, as loose overhanging rocks, if not discoverable by an inspection with the naked eye, could have been by prodding, as in this case. So that the similarity of the cases easily appears.

In *Every v. Rains,* the Court further said: "That the defendants did not know of the defect will not excuse them if in the exercise of reason-

able care it would have been discovered. The evidence tends to show that the defendants knew that it was necessary to inspect this roof to guard against such injuries as the one causing the death of Every, and it was a proper question for a jury, under the circumstances presented, whether reasonable care had been exercised in making the inspection. The suggestion that the laborer could observe the defective roof as well as the employer is not persuasive. It was not the duty of the laborer to make inspection, but to attend to his work, while it was the duty of the employers to exercise proper care to make the place reasonably safe. It does not appear that the defect was open to the ordinary observation of the workmen, or that they were aware of the danger. It is insisted that Every assumed the risk of the injury, and that this is shown by the evidence, and by the special findings. It is said that the findings show that he was as well able to determine whether the drift was dangerous as all others who were working there. This may be true, and yet the defendants may be liable. The risks assumed by a servant in such a situation are stated in *Griffin v. Brick Co., ante,* p. 347, and need not be restated here. If Every knew that proper inspection had not been made, there is no finding that he was aware of the danger arising from the failure," citing authorities.

And again: "The servant does not accept the risks of unknown, latent, unseen, or obscure defects or dangers, such as the servant would not discover by the exercise of ordinary care and prudence, having reference to his situation, but such as the master ought to discover by exercising the duty of inspection, which the law puts upon him to the end of seeing that the premises, tools, and appliances, with respect to which the servant is required to labor, are in a reasonably safe condition," citing 4 Thompson Com. on Negligence, sec. 4641. *Deaton v. Lumber Co.,* 165 N. C., 560.

To those cases may be added *Quincy Coal Co. v. Hood Admr.,* 77 Ill., 68. It was held in *Ribich v. Smelting Co.,* 123 Mich., 401, that where extraordinary risks are or may be encountered, if known to the master, or should be known by him, the servant should be warned of these, their character and extent, so far as possible, citing *Smith v. Car Works,* 60 Mich., 501 (1 Am. St. Rep., 542). It has been held that "A corporation is responsible to its servants for the negligence of others servants entrusted with the duty of providing a safe place in which to work." Shearman & Redfield on Negligence (5 ed.), p. 341, sec. 205. The Court, when speaking of the duty of mine owners to their employees, said in *Mather v. Rillston,* 156 U. S., 391: "If an occupation attended with danger can be prosecuted by proper precautions without fatal results, such precautions must be taken by the promoters of the pursuit or employers of laborers thereon. Liability for injuries following a disregard

of such precautions will otherwise be incurred, and this fact should not be lost sight of." "A master," says the same Court, in *Railroad Co. v. Baugh,* 149 U. S., 368, "employing a servant, impliedly engaged with him that the place in which he is to work, and the tools or machinery with which he is to work, or by which he is to be surrounded, shall be reasonably safe. It is the master who is to provide the place and the tools and the machinery, and when he employs one to enter into his service he impliedly says to him that there is no other danger in the place, the tools, and the machinery than such as is obvious and necessary. Of course some places of work and some kinds of machinery are more dangerous than others, but that is something which inheres in the thing itself, which is a matter of necessity, and cannot be obviated. But within such limits the master who provides the place, the tools, and the machinery owes a positive duty to his servants in respect thereto. That positive duty does not go to the extent of a guarantee of safety, but it does require that reasonable precautions be taken to secure safety, and it matters not to the employee by whom that safety is secured or the reasonable precautions therefor taken. He has a right to look to the master for the discharge of that duty, and if the master, instead of discharging it himself, sees fit to have it attended to by others, that does not change the measure of obligation to the employee, or the latter's right to insist that reasonable precaution shall be taken to insure safety in these respects. Therefore, it will be seen that the question turns rather on the character of the act than on the discharge of some positive duty of the master." The Court further says that if the act is one done in the discharge of some positive duty of the master to the servant, then negligence in the act is the negligence of the master; but if it be not one in the discharge of such positive duty, then there should be some personal wrong on the part of the employer before he is held liable therefor. 3 Labatt's M. & S. (2 ed.), says, at sec. 1029 (p. 2727): "It is well settled that an employer is presumed to be familiar with the dangers, latent as well as patent, ordinarily accompanying the business in which he is engaged. Such knowledge is imputed to him on the ground that a person who combines with the ordinary measures of intelligence, which the law assumes every responsible citizen to possess, the special acquirements of persons engaged in the given occupation cannot, supposing him to have made a reasonably careful use of his faculties, fail to understand the extent and nature of the perils normally incident to that occupation. This doctrine requires him to take notice of the normal characteristic properties of the material substances which he uses, and the physical and mechanical laws which operate upon them."

And at section 2097 it is said: "Where the servant is not safeguarded by immediate abandonment of the use of the defective instrumentality,.

IN THE SUPREME COURT.

or by its immediate restoration to a condition of normal safety, it is clearly the duty of the master to warn the servant of the danger to which he will be exposed, unless he is known to have received information as to this from other sources." ·

And again, at section 1016 (p. 2699) : "The circumstances may sometimes be such that a jury would be justified in inferring that he ought also to have given the servant such instructions as would have enabled him to protect himself more effectually, during the period which was to elapse before the dangerous conditions could be remedied. It is conceived, therefore, that the true principle in this connection is that, under the circumstances supposed at the commencement of this section, the master is always culpable if he does not warn the servant, and may or may not be subject to an action on other grounds, even though he may have given the servant adequate warning."

The warning must, of course, be reasonably sufficient to put the servant on his guard, and so as to enable him to place himself beyond reach of the danger. *Rodney v. S. W. Railroad Co.,* 127 Mo., 676.

Labatt further says, 3 vol., sec. 1021 : "It is well settled that a master must respond in damages for an injury resulting from abnormally dangerous conditions, of the existence of which he was actually aware. This doctrine is immediately deducible from the general principle that knowledge is an essential ingredient of negligence, and that a person is always held liable for the natural and probable consequence of his own want of care. The master's knowledge of a dangerous defect in the place of work, or the instrumentalities thereof, raises this duty to warn his servant. This is a natural duty, prompted by a sense of common humanity."

Applying these principles to the facts in hand, we find that the defendant had regularly inspected the side walls and roof of the mine after a blast, and scaled the same to remove any loose, or overhanging rock, before the mucking of the mine began. The hands were not usually allowed to enter the mine until this was done, and it would be exposing them to an unnecessary danger if they had been permitted to do so, for the rocks were very large, the one in question weighing nearly a ton. The morning of the accident it seems that the inspection and scaling were not completed when the hands entered the mine with the cars for the purpose of removing the muck. The plaintiff and Hughes had, earlier in the day, filled their car under that part of the roof from which the rock fell, and taken it out of the mine. They returned and were ordered to stop, or wait, until the walls were scaled, and they scotched their car and waited. It seems that the rock first attracted the attention of Hughes, who had been ordered to come with his light. When he saw it he said: "There is a rock I do not like the looks of." This was in a part of the wall where an inspection had been made and scaling done.

If Hughes discovered, when he first saw it, that the rock was in a dangerous position and likely to fall, it was evidence from which the jury might reasonably infer that the inspection and scaling had not been carefully performed, and it would, therefore, be evidence of negligence, for inspection is one of the master's primary duties to his servant, and cannot be delegated, so as to relieve him of responsibility. It is the same as if he had done it himself. Whether the rock fell from a part of the wall which had been gone over that morning, or from a section of it which was then being scaled, was a question for the jury upon the evidence. It is the master's duty, when he discovers a danger, of which the servant is ignorant, to give him reasonable warning of the same, so that he may take proper care of himself.

"It makes no difference what is the nature of the peculiar peril, or whether it is or is not beyond the master's control. And it is not enough for the master to use care and pains to give such notice. He must see that it is actually given. If, therefore, he fails to give such warning, in terms sufficiently clear to call the attention of his servants to a peril of which he is or ought to be aware, he is liable to them for any injury which they suffer thereby without contributory negligence. Such notice must be timely—that is, given in sufficient time to enable the servant to profit by it. It is, therefore, the duty of the master to give adequate and timely warnings of changes in the situation involving new dangers." 1 Sh. & Redf. on Negligence, sec. 203, and note 5.

Under the evidence the jury could have found that the defendant knew of this danger, through Hughes, and that the servant did not know of it, and was not properly warned. Ed. Hughes spoke to the others about it, but plaintiff was standing some fifteen feet away, near his car, and Hughes testified that he might have heard his remark, though it was not addressed to him, if he was listening. There was no other evidence that he had heard it, nor that he was listening at the time, and the plaintiff said that he did not hear it. So that the situation is a simple one. The company knew of the danger through those placed there by it in charge of the work, and failed to properly notify the plaintiff, as the jury could have found, and no doubt did find, when the verdict is construed in the light of the evidence and the charge, as should be done. The plaintiff testified that it was the custom to cry out, "All right," when they had finished the scaling, and that some one did so; that he thought it was "all right" to push the car in there for loading. He did so and stepped back to his car and below it, and waited for his partner, Ed. Hughes, to come and help him, and "that was the last he knew," as the rock then fell from the roof and knocked him down.

This was very dangerous work, and it behooved the master to exercise that degree of care which the situation, known to him, suggested as

reasonably necessary for the protection of his servant, and which a man of ordinary prudence would have taken in like circumstances. It is evident, and we think the jury has so found, that the plaintiff was ignorant of his unsafe condition. He had worked the same morning, and safely, under the same rock that fell, and he discovered no defect in the roof, nor had the inspector until Ed. Hughes came up with the light; he was standing where orders had placed him, and stayed there in the full consciousness of being safe, though it proved that he was really within the zone of danger. He would have gone further away and to a place of absolute safety, as we must suppose, if the master had performed his duty and made known to him that the rock was likely to fall, after he, or the person who represented him, had acquired knowledge of the servants's perilous position. There was evidence that the inspector was negligent in not discovering the defect, for Ed. Hughes noticed it when he was called there to bring the lantern. A servant assumes all the usual and ordinary risks attendant upon his employment, not including risks arising from negligence of the master, and he assumes the latter, as well, if he knows of the defect from which they arise, and appreciates the dangers which flow from such defects. *Fotheringill v. Washoe Copper Co.,* 43 Montana, 485. But he did not know of this defect, and could not, therefore, appreciate the danger.

We are of the opinion, after a careful examination of the case, both law and fact, that there was ample evidence of negligence to support the verdict.

Exceptions were taken to the charge of the court, but we regard it as free from error. Most, if not all, of the objections to the charge are condemned by the rule that where there is more than one proposition embraced by that portion of the charge to which exception is taken, and any one of them is correct, the exception as a whole will fail. *Quelch v. Futch,* 175 N. C., 694, and cases cited. As an example of this class of exceptions: The court charged, among other things, that it is not the duty of the defendant "to insure the plaintiff against any possible injury." We do not presume the defendant would except to such an instruction, and yet it is found separately stated among others, and to all of these exception was taken. Some of the exceptions are to the statement of contentions, which we will not review unless the statement was not only erroneous, but the court's attention was called to it at the time, when the judge had opportunity to correct the mistake. *Mfg. Co. v. Bldg. Co.,* 177 N. C., 103; *Alexander v. Cedar Works, ib.,* 138. The modification of the second prayer for instructions, as to contributory negligence, was not erroneous. The court should not have given the instruction if based on facts contrary to defendant's contention, for in that case there would be no contributory negligence. But we think the

instruction might well have been refused, as the evidence did not justify it without amendment, if it was justified at all. The second request for instructions was properly refused, as the evidence of plaintiff would not warrant such an instruction. There was evidence to show freedom from negligence on the part of plaintiff.

If the defendant desired an instruction as to the second breaking of the plaintiff's leg, he should have asked for it. This was its plain duty. *Simons v. Davenport,* 140 N. C., 407; *Potato Co. v. Jeanette,* 174 N. C., 237; *Alexander v. Cedar Works,* 177 N. C., 137. In the case last cited, we said: "If the instructions of the court to the jury were not sufficiently full and explicit, or plaintiffs desired any particular phase of the case to be stated, they should have submitted a special request for what they wanted." The judge states that no such request was made in this case.

The motion for nonsuit was properly overruled.

The other exceptions are plainly insufficient to cause a reversal. Directing the jury to ascertain "what the trouble is," must have been understood by them, and is without any harm to the defendant. Besides, what was meant was afterwards fully explained. This exception also is to several propositions, and fails under the rule before stated.

We have carefully considered this case in all its aspects, and find no error in the record.

No error.