LEON COOK v. CAMP MANUFACTURING COMPANY ET AL.

(Filed 19 October, 1921.)

**1. Employer and Employee—Master and Servant—Dangerous Machinery —Safe Place to Work—Negligence—Evidence—Questions for Jury.**

It was the sole duty of the plaintiff, an employee of the defendant, to keep its power-driven and dangerous machinery in repair, and under the defendant's rules, to notify those operating the engines to stop when he was about to make repairs; and, also, when he had made them. There was a system of signals for starting and stopping the large engine operating the main machinery, but none as to an engine operating a smaller portion, which started without warning, and caused the injury to the plaintiff while in the course of his employment: *Held*, sufficient evidence to be submitted to the jury on the issue of defendant's actionable negligence, in not equipping the smaller engine with a similar system of signals to that of the larger one.

**2. Same—Duty of Master—Delegated Authority.**

Where the plaintiff was employed to work among dangerous machinery in repairing it while it was not running, it is the duty of the employer to warn him, while engaged in this duty, that the machinery was to be started again, and when an injury is thus proximately caused by the neglect of the employer or his agent, it is evidence of actionable negligence, from which the employer may not escape liability by having delegated this duty to another.

**3. Same—Vice Principal.**

The duty of the employer to furnish his employee a safe place to work among dangerous machinery and surroundings is one implied in the contract of hiring, and if he commits to any other employee or servant the duty of maintaining and keeping it safe, the agent delegated to perform this duty *pro hac vice*, stands in the place of the employer, who may not escape liability for damages because he has delegated this duty to another.

**4. Employer and Employee—Master and Servant—Negligence—Rule of the Prudent Man.**

It is not alone sufficient that the master has furnished his servant such machinery, tools, and appliances as are usually furnished for doing the work under dangerous conditions similar to those in which the servant is required to work, that are known, approved, and in general use, but he must further take such precautions for his servant's safety as an ordinarily prudent person charged with a like duty should and ought to have foreseen were necessary and proper under the circumstances.

STACY, J., concurs in the result; WALKER, J., dissenting.

APPEAL by plaintiff from *Bond, J.*, at March Term, 1921, of DUPLIN. This was an action for personal injuries received by plaintiff at the sawmill operated by the Camp Manufacturing Company, but owned by its codefendant, through the alleged negligence of the defendants. On motion of the defendants a judgment of nonsuit was entered and the plaintiff appealed.

*E. K. Bryan and George R. Ward for plaintiff.*
*Rountree & Carr, Stevens, Beasley & Stevens for defendants.*

CLARK, C. J.   It appears that the Carolina Timber Company owned the sawmill at which the plaintiff was working at the time of the alleged injury, and the mill was being operated by its codefendant, the Camp Manufacturing Company.   The plaintiff was employed to repair the machinery and chains and equipment attached to the fire-room and the big engine, but he was not operating any of the machinery.   Whenever any part of the machinery which it was the plaintiff's duty to repair broke down or got out of order, the plaintiff had authority to stop the engine running it in order to make the repairs, and was also required to notify the operators of such machinery that it had been stopped for

repairs, and it was the duty of those operating the machinery to see that it was not thereafter started until notice from the plaintiff. This was the rule of the company under which the plaintiff was required to do his work.

The machinery in the sawmill proper was run by a big engine connected with which there were whistles to notify employees when the machinery was going to be stopped, and after being stopped, when it would be again started. There was a smaller engine in another room which ran the dust chain in which the plaintiff was caught and injured. There were no signals attached for starting or for stopping the machinery operated by the small engine. This dust chain carried fuel to the boilers which generated steam for running both engines. The plaintiff was compelled to rely upon the observance of the company's rule for his protection while repairing the engine and machinery.

On this occasion the plaintiff, on going into the room of the little engine which ran the dust chain, discovered that the pilot chain which in turn drove the dust chain, had been caught at some point in the dust house by an obstruction which stopped its moving, and thus had broken the pilot chain. He then went to the men who operated the engine, pulling the dust chain, and told them he had shut down the dust engine in order to go into the dust house to make the necessary repairs to the dust chain there, and in accordance with the rules of the company, he notified them not to start the engine and machinery connected with the dust chain until he had advised them that the repairs were complete and everything was ready for operation. He then went into the dust house, and finding a lightwood knot had been caught by the dust chain which stopped it, he, with the aid of another employee, began to remove the lightwood knot. He had just succeeded in doing this, and while in the act of stepping from astride the dust chain, the operators of the dust engine suddenly, without warning, started up the dust engine, which caused the dust chain to catch his foot, and winding around his foot and leg, it was only by grasping two posts he prevented himself from being ground up. His helper ran into the engine room and had the power turned off. The evidence further shows that shortly after the plaintiff had caused the engine to be shut down and notified the operators not to start the same, one of them went out of the engine room to a lumber pile, and returning after a delay of some twenty or thirty minutes, was ordered by some one to turn on the power. He replied that the engine had been stopped for repairs to the dust chain, and asked if the plaintiff had come out of the dust house, and being erroneously told that he had, the power was turned on, causing the injury to the plaintiff as above stated.

Upon this evidence, the case should have.been submitted to the jury:

1. It was the duty of the defendants, operating highly dangerous machinery, to have given the plaintiff a safe place in which to work. There was a system of signals for starting and stopping the machinery connected with the larger engine, and if a similar system had been used in regard to starting and stopping the machinery connected with the dust chain by running a wire to the room in which the engine operating the dust chain was located, or a similar or a small whistle had been put on the steam pipe leading to the dust engine, notice would have been given to the plaintiff, which would have enabled him to escape this injury. The circumstances in evidence as to the manner of the injury are *prima facie* evidence of negligence in not equipping the smaller engine with a signal such as was placed upon the larger engine, to give notice of its starting up. At least, this was sufficient evidence of negligence to have been submitted to the jury.

2. In *American Car Co. v. Rocha* (C. C. A.), 257 Fed., 297, it was held that where a plaintiff was at work under a car which had been raised from its trucks and blocked up, his employer owed him a positive duty to warn him before the car was moved, which could not be delegated to another employee so as to relieve itself from liability for its negligence resulting in plaintiff's injury. This judgment by the United States Circuit Court reviewed and affirmed the judgment to the same effect in the District Court. The appellant then moved in the United States Supreme Court for a *certiorari,* which was denied.

In *Collins v. Bonner,* 268 Fed., 699 (Court of Appeals D. C.), it was held that an employer under his duty to give the employee a safe place in which to work is negligent if the hoisting engineer in his employ starts an engine regardless of conditions whereby an employee is injured.

In *Ondis v. Tea Co.,* 82 N. J. L., 511, it was held, "When the place assigned the employee to work is safe for him while the machinery, with which he is obliged to come in contact, but which he is not operating, is at rest, and which is liable to become of great peril to him. when such machinery is put in motion, and a method of warning him of such starting by another employee who is in control of the engine, has been the rule adopted by the company, the neglect of the latter to give the warning is to be imputed to the employer." This is an elaborate opinion, concurred in by all the Judges in that case, and is exactly on all fours with the case at bar.

The duty of the master to provide and maintain a reasonably safe place for the servant to work is implied in the contract of hiring, and if he commits to any other employee or servant the duty of maintaining

and keeping a reasonably safe place for that purpose, then the agent to whom this duty is committed is *pro hac vice* the representative of the master, who is liable to the same extent as if he had personally performed the negligent act. *Buchanan v. Furnace Co.*, 178 N. C., 646. To the same purport are *Evans v. Lumber Co.*, 174 N. C., 31; *Odom v. Lumber Co.*, 173 N. C., 134; *Patton v. Lumber Co.*, 171 N. C., 837; *Wooten v. Holleman, ib.*, 461; *Midgett v. Mfg. Co.*, 180 N. C., 24.

The evidence shows that under the rules under which the plaintiff was working when the machinery was set down for repairs, the persons to whom the master had committed the running of the engine should not start up until the plaintiff notified the operator that the machinery was ready for running. This rule was a representation to the employee that the employer would see to it that the machinery was not started while the plaintiff was repairing it. It was equivalent to a promise to that effect, the execution of which could not be shifted off to some other employee, and for damages sustained from a breach of the same, if so found by the jury, the employer would be liable.

3. The duty of the master is not fully performed by simply doing that which is usually done, or furnishing machinery and tools known, proved and in general use, but he must take such precautions in addition thereto as an ordinarily prudent person charged with a like duty should have and ought to have foreseen were necessary and proper under the circumstances. *Taylor v. Lumber Co.*, 173 N. C., 112; *Dunn v. Lumber Co.*, 172 N. C., 129; *Ainsley v. Lumber Co.*, 165 N. C., 122; *Kiger v. Scales Co.*, 162 N. C., 133.

It was also earnestly debated before us whether, the sawmill being highly dangerous machinery, the owner could relieve itself from liability for the negligence of its lessee, and also whether the lease by the owner to the lessee, both companies having the same identical stockholders and officers, was such a lease as would protect the owning company from being liable for the negligence of the operating company. As the case must go back anyway, it is not necessary to pass upon these propositions, as on another trial the evidence on these points may be more fully brought out, and possibly, if the parties are so advised, issues of fact may be submitted in regard thereto.

The judgment of nonsuit is set aside, and there will be a

New trial.

STACY, J., concurs in result.

WALKER, J., stating the case for his dissent: In dissenting from the opinion of the Court, and the order directing a new trial, I find it necessary to restate the testimony to some extent, so that the salient facts may

14—182

appear, as I find them in the record. They will be stated sufficiently to give plaintiff's case its full strength, and the benefit of all material or relevant facts. (The italics below are mine.)

The plaintiff testified as follows: "I went to the Camp Manufacturing Company, and Mr. Rowe came over here and offered me a job, and told me to go to Mr. Camp. Mr. Rowe had been down to see Mr. Camp. Mr. Camp wrote me, or the Camp Manufacturing Company did, and I was employed over there at the time. I then decided to accept the position with them and work for them. I had my conversation with Mr. John Camp about the employment. *I was employed by Mr. Camp, of the Camp Manufacturing Company.* I just had a letter from Mr. Camp, from him individually, about my employment. The letter wasn't signed individually, but it was signed Camp Manufacturing Company, and Mr. Camp dictated it. When I first went to work they paid me every two weeks, I believe. I got my pay envelope. It was marked on it from the Camp Manufacturing Company. They just handed me the pay envelope. My time was kept. *I never did get one with the Carolina Timber Company on it.* . . . I was injured on 13 July, 1918. I was coming around the end of the dust house, between the dust house and the mill, and I noticed that the big chain that fed the cross chain that went into the fireroom and fed the chain that went to the boiler had stopped; in fact, the main chain that pulled the dust from the dust house—to make it short, I noticed that the pilot chain that drew the large chain was broken, and in order to fix this boiler chain, I shut the little engine down, which was running. I did that because it pulls this dust chain, and the little pilot chain was broken. Before I went on to fix that little chain, I had the engine shut down. I would think it was a part of my duty to shut down the engine, if I wanted to repair the chain. It would not look advisable for it to run all the time when it was not doing anything. I had authority to shut it down to overhaul this chain; that is, the little chain that pulls the big chain, and being a practical man, I knew there was some trouble in the back end of the house— somewhere in the main big line of chain that little pilot chain dragged. And so I stepped to the boiler-room door, and John Southerland and Henry Peterson were there. Henry Peterson was fireman and John Southerland was his helper. John Southerland was looking right at me, and so was Peterson. They knew positively something was wrong there, as they always know. I told them, I says 'John, don't start this engine up, because I am going to the rear of the dust house to see what the trouble is, and don't start it until I notify you, or come myself.' Henry Peterson was standing right there and heard it all. I meant it for both. Of course, Henry was the fireman. John was the operator of

this engine, and he is the one that generally stopped and started it. John was the operator. He operated it nearly all the time. So I went to the rear end of the dust house. Henry was fireman; John was his helper."

Witness further testified that after making the necessary repairs he started to step over the chain and was caught and injured, and on cross-examination he said: "John Southerland was helper to the fireman, who was Henry Peterson, and who looked out for the furnaces. He just pulled little chips from the head in the draw and let the dust run down, and kept it pushed down with a stick. He looked after the large boilers. Wallace was the belt-maker, and looked after the belts. John Southerland was helper to Henry Peterson; was not hired by me, and I don't know anything about him. John Southerland was dust-cutter; he went in the dust house and cut the dust, started the engine and stopped the engine whenever Henry told him he wanted dust, and whenever he thought they needed any dust. He was just Henry Peterson's helper—just dust-cutter. He would go in the house and start and stop the mill engine; he had to do that to cut his dust. When John wasn't there Henry Peterson did that. John was helping Henry Peterson. He was assisting Henry Peterson in operating the engine. My duties were to go around and see that everything was kept in running order. I was notified when there was anything wrong. *It was my duty to keep things running, to keep them in good condition.* I was not fore-man. Mr. Rowe was foreman. John Southerland had certain things to do. Richard Wallace had certain things to do. Peterson had a certain job to do. They were all doing certain jobs in and about operating and running the mill. *It was my duty to see that all these things were kept in fit—in good order.* I was not working in the same department with them unless something happened and I was called in. *I was overseer of the same things they were doing—looking after the same machinery they were running.*"

John Southerland, witness for plaintiff, testified: "I had been work-ing there about two years off and on. Henry Peterson worked in the room with me. Henry Peterson's duties were—he was water carrier. My duties were to cut dust when he told me to, and every day or two, when the big mill stopped, I started up the dust engine and cut there—every morning piled up ashes out of the ash box, and did just anything he told me—whatever Henry Peterson told me to do. I know Mr. Cook. I was right there when Mr. Cook got hurt. Always when he stopped the engine he would come to us and tell us not to start it up until he notified us. He came in there and told us that day, says, 'I have stopped the engine'; he had to go back to the back end of the dust

house, and says, 'Don't start it until I notify you.' Pretty soon after he went in there and went to work I went out to the green run (meaning the yard where the green lumber was piled). I stayed up there I reckon twenty-five minutes. When I came back the steam was getting kind of low in the furnace—burned up pretty well, and Mr. Henry told me to start up the engine and cut him some dust. I asked him was Mr. Cook gone, and .he says, 'Yes, he has gone out,' and so I went ahead and started up the engine, and it run about four or five yards, and the belt commenced slipping on it, and would not pull, and so I prized it back and started it again, and I heard somebody holler, and I looked back in there and saw Richard Wallace run back in there, and I went there to see what the trouble was, and Mr. Cook was hanging in the chain, holding up there with his hands."

WALKER, J., dissenting from the opinion of the Court: The foregoing substantial statement of all the material testimony will suffice to present the plaintiff's case in its entirety, and at its best. I am thoroughly aware of the oft-repeated rule that, on a motion to nonsuit, evidence should be construed in the most favorable light for the plaintiff *(Brittain v. Westhall,* 135 N. C., 492; *In re Will of Margaret Deyton,* 177 N. C., 503; *Angel v. Spruce Co.,* 178 N. C., 621; *Spry v. Kiser,* 179 N. C., 417), and I will so deal with it. After doing so, I can find no evidence in the case upon which the plaintiff can ask for a verdict, as, in my judgment, there is nothing that shows any negligence on the part of either defendant.

The first assignment of error is the nonsuiting of plaintiff as to the Carolina Timber Company; and defendants contend there is no evidence against the Carolina Timber Company. The plaintiff offered in evidence a deed for the mill plant to the Carolina Timber Company, but did not see fit to offer any further evidence from the records or from witnesses who knew the relations between the Carolina Timber Company and the Camp Manufacturing Company.

It is clear from the testimony that Henry Peterson and John Southerland, who started up the engine, were fellow-servants of the plaintiff, and their act was the proximate cause of the injury.

The recognized rule in England, which generally prevails in this country, and affirmed by this Court, is declared to be: That the term fellow-servant includes all who serve the same master—work under the same control—derive authority and compensation from the same source, and are engaged in the same general business, though it may be in different grades and departments of it. *Kirk v. R. R.,* 94 N. C., 625; *Rittenhouse v. R. R.,* 120 N. C., 544; *Olmstead v. Raleigh,* 130 N. C.,

243; *Hobbs v. R. R.,* 107 N. C., 1. There is no evidence showing that the place was unsafe; that the machinery was defective; that the employees were incompetent, or that there was any other failure in the duty which the defendants owed to the plaintiff.

The statute denying the fellow-servant rule as a defense to railroad companies cannot apply in any event in this case. Defendant asserts that the effort of the plaintiff to make the Carolina Timber Company a defendant grows out of plaintiff's purpose to show the ownership of the railroad, and thereby forbid to the defendant, Carolina Timber Company, protection of the fellow-servant rule, and it is argued by defendants' counsel that the fact that the plaintiff is so persistent in the prosecution of the timber company, shows that he is convinced that the party causing the injury was a fellow-servant. It may be conceded that a lumber company, operating a logging road, comes under the provisions of this act if the injury occurs in the railroad operations. *Hemphill v. Lumber Co.,* 141 N. C., 487; *Bissell v. Lumber Co.,* 152 N. C., 123; *Wright v. R. R.,* 151 N. C., 529; *Bird v. Leather Co.,* 143 N. C., 283; *Liles v. Lumber Co.,* 142 N. C., 39. The Fellow-servant Act applies to all employees of a railroad company, whether working in the transportation or other departments. *Sigman v. R. R.,* 135 N. C., 101. But, as to lumber companies and other companies operating railroads, the act only applies when the party injured is operating in the transportation department. *Twiddy v. Lumber Co.,* 154 N. C., 237, approved in *Buchanan v. Furnace Co.,* 178 N. C., 647.

The fourth assignment is based upon the assumption that it was negligent not to have a whistle on the dust engine, when there was one on the large mill, the defendants contending that there is no evidence whatever that a whistle was necessary on the dust engine. This assignment of error is so vague that it is difficult to discuss it with reference to the testimony. The only reference to this matter appears on pages 30 and 31 of the testimony, as follows: "When the machinery connected up with the big engine was going to be started up, after being stopped, they had a system of blowing whistles before they started it. They had no such system of signals in regard to the dust engine and machinery connected with it. . . . They could have installed a system of whistles for the dust-chain machinery. Just had a smaller whistle than the one that started the big engine; run a wire across and tack onto the boiler and pull it, or have a wire to the engine, either one—just small, the same way they had of starting the big engine upstairs." All that this means is that the sawmill proper had a whistle and blew it when the mill was about to be started, and that the dust engine, which was a

subsidiary piece of machinery or equipment for the purpose of regulating the sawdust by discharging it into the furnace, did not, have such a whistle. It might have been said with equal truth that there was no such whistle attached to the pump-engine or any other subsidiary machinery which was operated from time to time when needed. There was no evidence that such a whistle was in customary use or was necessary as a means of safety, and before the plaintiff can establish this as negligence he would have to show that such equipment was an up-to-date equipment in general use, and that the defendant had negligently failed to put it into use here.

But the important and vital question to be considered is, whether there is any evidence, when it is favorably construed for the plaintiff, which justifies us in reversing the studied and deliberate ruling of the court below and ordering that the case must be submitted to the jury.

This is not a case where the owner of the mill, and its machinery, had appointed some one as vice-principal, or his representative, to supervise the operation of the same, who was guilty of negligence causing the injury, which will be implied to his principal. The facts, while there was very much evidence in the case, are few and simple.

The plaintiff, Leon Cook, himself either stopped the machinery or gave the order to stop it, so that he might go in and repair the pilot chain and remove any obstruction which hindered the effective operation of the machinery, such as the lightwood knot in the chain at the lower sprocket. The plaintiff (as he himself alleges), "in the performance of his duty, got astride of said chain, which, being idle at the time, was slack, and with the assistance of a helper, removed the obstruction; and at the time the plaintiff was in the act of stepping clear of the dust chain, the defendant negligently started the dust engine, and plaintiff was caught therein and injured." But who directly and negligently caused the injury? It was not the defendants, but the fellow-servant of the plaintiff who received the request from him not to start the machinery until he came back, or in other words, the fireman and his helper. We have shown that they were the plaintiff's fellow-servants by the highest authority *(Kirk v. R. R., supra),* a case decided thirty-five years ago, and which has been frequently cited and approved since that time. That case is identical, in principle, with this one. The engineer, Harris, was ordered not to move his switch engine until work, or inspection required to be done underneath the cars, was finished, and he was notified of the fact by the yardmaster. In spite of this order, the engineer did move the train before the work was completed and the plaintiff's arm was cut off. The railroad company was acquitted of all liability by this Court, and owing to the contrary ruling below, there was

a new trial. The yardmaster and the engineer represented the railroad company as much in that case, as did the fireman and helper in this one, and yet it was held that there was no liability because the plaintiff and those two men were fellow-servants. The fellow-servant law, as to railroad companies, has been repealed since that case was decided, but the principle it established is as firmly entrenched as ever, and is applicable wherever the doctrine of fellow-servant is still applicable.

The employer, in this case, could not have supplied anything, whistle or what not, which would have been more effective than the means then at hand to avert the injury. If there had been a whistle, or the most approved contrivance in that respect, the result would have been the same, if the fireman had been negligent, as he was here, and failed to blow it, and give the proper warning to Cook to get out. The question is not whether there was a whistle, but whether the means available at the time were sufficient to prevent the resultant injury. If the direction had not been given to start the engine the plaintiff would have escaped without any harm being done to him, there being ample means at hand to prevent it. The parties at the mill were abundantly able to save the plaintiff from any injury, and he would not have been hurt if it had not been for the negligence of his fellow-servant who started the machinery, or caused it to be started. Leon Cook had finished his work and was in the act of leaving the place, when the machinery was put in motion. The mistake was made by the fireman, or his helper, in supposing that Cook had already left and was in no danger, and this mistake would still have been made had every piece of machinery been supplied with a whistle. What caused the injury was not the want of a whistle, but the reliance of the fireman, or helper, upon his own mere supposition, to which he carelessly trusted, that Cook had left the place of danger, instead of having certain knowledge that he had left before giving the order to start the machinery.

The fellow-servant doctrine has no force or effect if it does not apply to this case, and the fireman and his helper were surely fellow-servants of Cook within the rule stated in *Kirk v. R. R., supra.*

Finally, the situation could not have been saved by anything the employer could have done. There is no suggestion that the fireman or helper was of a careless habit and known by the employer to be so. It was just the false reliance of the fireman or his helper upon mere supposition as to where Cook was, instead of upon actual knowledge, and the result would have been the same if there had been a whistle on the smaller engine, as the fireman and his helper would still have acted upon the same supposition, for they were told not to start the machinery,

in any event, until Cook returned, or, to use his words, until he came back. In the *Kirk case, supra,* the engine had not only a whistle but also a bell to give signals, by a blast of the one or the ringing of the other, and the engineer used neither, but violated instructions by moving the train. That case and this one are clearly analogous, as there he moved the train without receiving notice from the yard master, while here the fireman and his helper started the machinery without notice from Cook, the plaintiff, and caused the injury.

No one questions the principle that the master must furnish a reasonably safe place for the servant to do his work *(Marks v. Cotton Mills,* 135 N. C., 287), and that this is a primary duty devolving upon the master which he cannot without liability therefor delegate to another. But that question does not arise here, as plaintiff himself undertook to do the work and to provide for his own safety, in his own way. He trusted too much to the fireman and helper, and is himself solely responsible, in law, for the consequences. Of course the timber company cannot be liable unless the Camp Manufacturing Company is liable. But there is nothing to charge it with liability, either upon the evidence or under the principle laid down in *Logan v. R. R.,* 116 N. C., 940, and cases citing it, which will be found in the annotated edition of 116 N. C., marginal page 940, at pp. 952-953, and in Shepard's N. C. Citations (1 ed.), at p. 172, and issue of June, 1921 (Advance Sheets), p. 46.

It further appears that the *Logan case, supra,* does not apply here, as it was distinctly put upon the ground that the North Carolina Railroad Company was a *quasi*-public corporation, and could not, therefore, lease its road and discharge itself from liability for neglect of the duties it owed to the public. It exercised, at least in a *quasi*-sense, a public franchise, granted to it by the State in its sovereign capacity, and could not disable itself to perform its public duties by a lease without responsibility for injuries to others caused by the negligence of the lessor in operating the road.

My conclusion is that the nonsuit was proper, and that the judgment should be

Affirmed.