### STATE v. SUNCREST LUMBER COMPANY.

(Filed 26 September, 1923.)

**1. Sunday—Criminal Law—Railroads—Logging Roads.**

A lumber railroad, over which steam locomotives haul logs, comes within the provisions of C. S., sec. 3480, making it a misdemeanor for railroads to permit the operation of trains, etc., on Sunday, whether it transports freight or passengers, for hire or otherwise, and it is immaterial whether it was for the sole purpose of supplying its extensive lumber manufacturing plants on Monday.

**2. Same—Constitutional Law.**

The setting aside of Sunday as a day of rest and quiet is not a religious, but a police regulation, necessary to the health and welfare of the people, and it applies to railroads, including logging roads (C. S., sec. 3480), to the employees therein engaged; and the provisions of our Constitution requiring religious liberty have no application.

APPEAL by defendant from *Bryson, J.*, at July Term, 1923, of HAY-WOOD.

The defendant was convicted, at July Term, 1923, of Haywood, of the offense of operating a train on Sunday. The following was the special verdict:

That the defendant, the Suncrest Lumber Company, is a corporation, duly organized under the laws of the State of Delaware, and is authorized regularly and duly licensed to do business in the State of North Carolina under its charter; that the said Suncrest Lumber Company is an industrial corporation, without authority under the laws of North Carolina to operate and maintain a public-service railroad, and owns a large boundary of timber in the mountains of Haywood County, and is engaged in cutting and removing said timber to its sawmills, where the same is manufactured into lumber; that said defendant owns two band sawmills, situate in said Haywood County, and for the purpose of conveying the logs, which are cut in the woods, to its mills, owns and oper-

ates a standard-gauge private railroad, and draws cars, loaders and other necessary instrumentalities over said railroad track by means of locomotive engines, which are propelled by steam; that on its said railroad the defendants haul only its logs aforesaid, and its necessary provisions, supplies, implements, etc., for itself and laborers employed by it, and is not now, and was not at the time of the finding of the bill of indictment in this cause, a common carrier, and was not and is not engaged as a common carrier of freight or passengers; that the defendant employs in the prosecution of its business as a lumber corporation a great number of men in the woods, on the railroad, and in its two band sawmills, and in order to have sufficient logs at its mills to operate the same on Mondays and furnish employment for its men engaged in said mills, it, at times, operates its said railroad on Sundays and delivers logs by means of operating said railroad to one or both of its said mills; that on 24 September, A. D. 1922, the same being Sunday, the defendant operated, or caused to be operated, one of its steam locomotives upon its railroad, and ran the same into the mountains, and loaded, or caused cars drawn by it to be loaded with logs, and delivered the same to its sawmill for the purpose of being sawed into lumber on the following day, to wit, Monday.

If, upon the foregoing facts and special verdict, his Honor is of the opinion that the defendant is guilty, as charged in the bill of indictment, then we, the jury, return for our verdict "Guilty"; and if, upon said facts and special verdict, his Honor is of the opinion that the defendant is not guilty, then our verdict is "Not guilty."

Upon the return of the special verdict of the jury, the court being of opinion as a question of law, the jury, upon the facts, found that the defendant is "Guilty."

Upon the verdict the court sentenced the defendant to pay a fine of $500 and costs. Appeal by defendant.

*Attorney-General and Assistant Attorney-General for the State.*
*Merrimon, Adams & Johnston for defendant.*

CLARK, C. J. The point presented for our consideration is the construction of C. S., 3480, which provides that "No railroad company shall permit the loading or unloading of any freight car on Sunday; nor shall it permit any car, train of cars or locomotive to be run on Sunday on any railroad, save in case of accident, except such as may be run for the purpose of transporting the United States mail, passengers with their baggage, and ordinary express freight in express cars exclusively, and except such as may be run for the purpose of transporting fruits, vegetables, livestock, and perishable freight."

The statute further provides that "Any railroad company violating the provisions of this section shall be guilty of a misdemeanor in any county in which such car or train of cars or locomotive shall run, or in which such freight car shall be loaded or unloaded, and upon conviction shall be fined not less than $500 for each offense."

There is no substantial difference between the language in this section, "No railroad company shall permit," etc., and the language of the Fellow-Servant Act (C. S., 3465). The expression used in the latter section is, "Any railroad company operating in this State," etc. In the latter case the Court held, in construing the statute, that it applied to lumber railroads, such as in the present case. *Hemphill v. Lumber Co.,* 141 N. C., 487. This ruling, that a lumber company comes within the words, "railroad company," has been approved some twenty times by the Court, from the *Hemphill case,* 141 N. C., 487, down to *Cook v. Mfg. Co.,* 182 N. C., 213, and *Craig v. Lumber Co.,* 185 N. C., 562.

In *Hemphill v. Lumber Co., supra,* the Court held that the terms, "any railroad company operating in this State," embraced a logging road, because, though it is not a common carrier of freight and passengers, its employees engaged in the operation of its trains are exposed to the same dangers and risks as are employees of the railroads operating as common carriers, and come within the spirit and intent of the act; and that the use of the word "railroad" designates any road operated by steam or electricity on rails.

In *Melville v. Easley,* construing what is now C. S., 3955, the Court said: "The statute in its operation is confined to manual, visible or noisy labor, such as is calculated to disturb other people; for example, keeping open shop or working at a blacksmith's anvil." The Court held that the Legislature had power to prohibit labor of this kind on Sunday, on the ground of public decency. In *Rodman v. Robinson,* 134 N. C., 503, the whole subject and history of Sunday legislation is discussed, and it is pointed out that the power of the Legislature to prohibit labor on Sunday is founded, not upon religious considerations, but for economic considerations, which require an enforced rest in the arduous and strenuous avocations in life, and out of due consideration to public opinion, which requires some pause, not only in the wearing activities of life, but some abatement of the noise and bustle around us. That case has been affirmed eight or nine times since, down to *S. v. Pulliam,* 184 N. C., 687, where the subject was again fully considered.

It plainly follows, from the consideration of the legislation and the decisions construing it, that a lumber railroad, over which steam locomotives haul logs, comes within the evil which is forbidden by C. S., 3480.

In *Rodman v. Robinson,* 134 N. C., 509, this Court, citing provisions both of the State and Federal constitutions, said that to compel anyone by statute "to observe Sunday for religious reasons would be contrary to our fundamental law. The only ground upon which Sunday laws can be sustained is that, in pursuance of the police powers, the State can, and ought, to require a cessation of labor upon specified days to protect the masses from being worn out by incessant and unremitting toil. If such days happen to be those upon which the larger part of the people observe a cessation of toil for religious reasons, it is not an objection, but a convenience." In that opinion it was further said: "If it was presumption in Uzza to put forth his hand to stay the tottering ark of God at the threshing floor of Chidon, it is equally forbidden under our severance of church and state for the civil power to enforce cessation of work upon the Lord's Day in maintenance of any religious views in regard to its proper observance. That must be left to the consciences of men as they are severally influenced by their religious instruction. Churches differ widely, as is well known, on this subject; the views of Roman Catholics and Presbyterians, for instance, being divergent, and the views of other churches differ from both"; citing also the fact that "as a religious day of rest the seventh-day Baptists, as well as the Hebrews and some others, keep Saturday, and the Mohammedans observe Friday." In that case (*Rodman v. Robinson*), after reviewing the history of legislation and the decisions on the subject of Sunday observance, the Court says that while the statutes of the several States still differ on the subject of Sunday legislation, all of these enactments are now based upon the police power, that some rest may be guaranteed to the workers and to avoid offense by the noise and tumult of traffic and labor to the great majority who desire a day of quiet and peace for their devotional services.

The decision in *Rodman v. Robinson* has been often cited and approved down to *S. v. Pulliam,* 184 N. C., 687, as well as the case of *Hemphill v. Lumber Co.,* 141 N. C., 487, down to *Craig v. Lumber Co.,* 185 N. C., 562.

The hammer and the anvil and the trowel have long since ceased to ring on the Sabbath in the cities and places frequented of men, but in the forests and on the mountain sides there has still been shouting and the turmoil of men engaged seven days in the week in hauling logs by railroad. It was to prevent this and other discriminations that this act was passed, for violation of which this defendant has been convicted.

It was not so very long since women and children were harnessed abreast with dogs to haul coal out of the mines in England, and in the sweatshops in this and other countries children of four years of age

were enforced to daily toil for a living. They were beneath the consideration of the law which owed them no protection.

Some years since, in response to the growing humanity of the age, the New York Legislature passed an act prohibiting the working of bakers more than ten hours a day in a temperature of over 120 degrees. It was purely a police regulation like this, which protects the workers in the forests from seven days labor, and the highest court in New York held it valid; but the Supreme Court at Washington, by a vote of five to four, held it unconstitutional, because, as the lawyers of the employers contended, the bakers had "a right to contract," and the bakers were told that they must work as long as their employers should require, and at ovens as hot as they chose to heat them. *Lochner v. New York*, 198 U. S., 45. But when the great struggle for civilization came, and the manhood and youth of the country crossed the seas in defense of human rights, the government taking over the railroads, there was enacted the Adamson eight-hour law for all railroads, and no man questions it.

But, a few years since, in North Carolina it was not unusual in some industrial establishments for twelve hours labor to be required, and there was no limit as to the age of children in any. The first protection extended to the children came, not from the legislative department, but by an equally divided decision of this Court in *Ward v. Odell*, 126 N. C., 946, which was later followed up by a majority opinion in *Fitzgerald v. Furniture Co.*, 131 N. C., 636, and that in turn was succeeded by the present child-labor law.

In the last few weeks the United States Steel Company, the most powerful corporation in this country, without the decision of any court or any statute, bowed to the irresistible force of public opinion, abolished the seven-day week and twelve-hour day, and conceded a forty-eight-hour week to its employees, and the printing fraternities throughout the country and some other vocations have gained a forty-four-hour week.

The legislation here in question, which gives to workers in the secluded forests in the strenuous toil of hauling logs by rail the protection of the law against a seven-day week, is but part of the movement of the age.

It is clearly within the power of the Legislature to enact this statute, and twenty decisions of this Court have said that it extends to all railroads, with the exceptions named therein, and embraces these logging roads.

Justice to the employees has proven to be to the profit and benefit of the employer.

While it is true that in *Williams v. Mfg. Co.*, 175 N. C., 226, it was held that the comparative-negligence statute (C. S., secs. 3467-8-9) did

not apply to lumber roads, on account of the peculiar wording of the act, "common carrier by railroad," yet the General Assembly of 1919, in answer to this decision of the Supreme Court, declared that the act aforesaid should apply to logging roads and tramroads (C. S., 3470). This latter statute also tends to sustain the view that the terms, "no railroad company," in C. S., 3480, apply to a logging road engaged in hauling logs.

While, independent of statute, any person can do the work of an ordinary avocation, if it does not amount to a public nuisance, on Sunday as well as on any other day, the Legislature evidently intended that the prohibition against the operation of any railroad on Sunday should apply to the hauling of logs by any railroad used for that purpose. The object of the statute is to conserve the health and welfare of those engaged in the strenuous work of hauling logs by rail, and to preserve a decent regard for the quiet and orderly observance of a day of rest by prohibiting hauling logs and other freight, excepting mail and express and fruit and livestock and perishable freight, on Sundays.

No error.