### STATE v. O. Y. YARBORO.

(Filed 9 November, 1927.)

**1. Criminal Law—Appeal and Error—State's Appeal—Statutes.**

Where there is a verdict convicting a defendant of a misdemeanor under the provisions of a statute prohibiting the drawing of a worthless check on a bank under certain conditions, and a judgment has been rendered in favor of the defendant *non obstanti veridicto,* the State may appeal under the provisions of our statute. C. S., 4649.

**2. Constitutional Law—Statutes—Police Powers—Public Evil—Intent.**

As a part of the exercise of its police power, inherent in a State, the Legislature, when not prohibited by the State or Federal Constitution, may validly enact a statute to suppress a far reaching existing potential evil, making the commission of the prohibited act a misdemeanor, and punishable as a crime against the State, without reference to whether it was done with a fraudulent intent.

**3. Same—Worthless Checks.**

Our statute generally known as the Worthless Check Law, making it a misdemeanor for one to draw a check on a bank knowing that he had no funds on deposit therein sufficient to meet it or having made arrangement with the bank for its payment on presentment, is a valid exercise by the State of its police powers, the offense being the commission of the act prohibited by the statute, and not an imprisonment for debt prohibited by our State Constitution. Article I, sec. 16.

**4. Statutes—Fraud—Worthless Checks.**

The issuance of a check on a bank in violation of our "Worthless Check Law," is a false representation of subsisting facts that the maker has on deposit sufficient funds for its payment at the bank, upon its presentation, or that he has made the necessary arrangements with the bank therefor, and is in effect a fraud upon the payee, the payee accepting it in good faith.

STACY, C. J., and CONNOR, J., concurring; CLARKSON and BROGDEN, JJ., dissenting.

APPEAL by State from *Grady, J.,* at June Term, 1927, of HALIFAX.

The defendant was indicted and convicted of a breach of the following statute, which was ratified 2 March, 1927:

"An act to prevent the giving of worthless checks.

"Whereas, the common practice of giving checks, drafts, and bills of exchange, without first providing funds in or credits with the depository on which the same are drawn, to pay and satisfy the same, tends to create the circulation of worthless paper, overdrafts, bad banking, and check kiting, and a mischief to trade and commerce; and it being the purpose of this act to remedy this evil,

*"The General Assembly of North Carolina do enact:*

"SECTION 1. It shall be unlawful for any person, firm or corporation, to draw, make, utter or issue and deliver to another, any check or draft on any bank or depository, for the payment of money or its equivalent, knowing at the time of the making, drawing, uttering, issuing and delivering such check or draft as aforesaid, that the maker or drawer thereof has not sufficient funds on deposit in or credit with such bank or depository with which to pay the same upon presentation.

"SEC. 2. That any person, firm or corporation violating any provision of this act shall be guilty of a misdemeanor.

"SEC. 3. That the word 'credit' as used herein shall be construed to mean an arrangement or understanding with the bank or depository for the payment of any such check or draft.

"SEC. 4. That chapter fourteen of the Public Laws of nineteen hundred and twenty-five be and the same is hereby repealed.

"SEC. 5. That this act shall be in full force and effect from and after its ratification.

"Ratified this the 2nd day of March, A.D. 1927." Public Laws 1927, ch. 62.

After verdict the defendant moved in arrest of judgment. The motion was allowed and the State appealed.

---

STATE *v.* YARBORO.

---

*Attorney-General Brummitt and Assistant Attorney-General Nash for the State.*

*Ben T. Holden and White & Malone for defendant.*

ADAMS, J. On 22 March, 1927, the defendant drew a check on the Farmers and Merchants Bank of Louisburg, payable to the order of George C. Green in the sum of $100, which was to be credited on a fee charged the defendant for services rendered in part and in part to be rendered by the payee in the capacity of an attorney at law. When he delivered the check he assured the payee that it would be paid when presented at the bank. On the same day, for a similar consideration, he gave a check to W. H. Yarborough. He had no money on deposit and no understanding or arrangement with the bank for the payment of these checks, and for this reason when presented they were returned unpaid. Thereafter the defendant was indicted for a breach of the statute set out in the statement of facts. At the trial he declined to introduce evidence, and after the State had rested its case he moved to dismiss the action. This motion was denied, and he was convicted. Upon return of the verdict he moved in arrest of judgment on the ground that the indictment charged no criminal offense, and the court being of opinion that the statute denounces as a crime the mere non-payment of a debt without any finding of fraud or false pretense and conflicts with Article I, sec. 16, of the Constitution, granted the defendant's motion and arrested the judgment. The State excepted and appealed. C. S., 4649.

Under the general rule that judgment may be arrested only for errors which appear on the face of the record, it may be granted that an indictment charging the breach of a statute enacted in disregard of a positive constitutional inhibition manifests such error as will justify refusal to pronounce judgment in case of conviction. The principle is that everything charged in the indictment may be true and yet no criminal offense may have been committed. *S. v. Watkins,* 101 N. C., 702; *S. v. Marsh,* 132 N. C., 1000. An unconstitutional law is void and an act which it condemns is not a crime because the organic law is essentially the supreme law. *Ex parte Siebold,* 100 U. S., 376, 25 Law Ed., 717; *Huntington v. Worthen,* 120 U. S., 10, 30 Law Ed., 588. But the statute in question is presumed to be valid. Every act of the Legislature is presumed to be in harmony with the Constitution and all doubts are to be resolved in favor of its validity. This Court has said that an act will be declared unconstitutional only when no reasonable doubt exists. *S. v. Moss,* 47 N. C., 66; *S. v. Moore,* 104 N. C., 714; *Coble v. Comrs.,* 184 N. C., 342.

"There shall be no imprisonment for debt in this State, except in cases of fraud." Const., Art. I, sec. 16. If the statute is in conflict with this prohibition it cannot be upheld, for the manifest object of the section, first appearing in the Constitution of 1868, was the abolition of imprisonment for debt which had previously had legal sanction. The former law granted an execution against the body of the defendant in civil actions in which money only was recovered. It was not essential that fraud should be proved. The execution was a writ known as *capias ad satisfaciendum,* the office of which was to imprison the debtor until he had paid the debt, costs and damages. If he had property when he was taken into custody he could surrender it; if he had none he could take the oath of an insolvent. Laws 1773, ch. 4; Const. 1776, sec. 39; Revised Code, ch. 59; *Burton v. Dickens,* 7 N. C., 103; *Jordan v. James,* 10 N. C., 110; *Crain v. Long,* 14 N. C., 371; *McNair v. Ragland,* 17 N. C., 42; *Griffin v. Simmons,* 50 N. C., 145. The constitutional provision of 1868 was intended to annul the old law and to interdict imprisonment for debt except in cases of fraud. It has been said that the framers of the Constitution, in forbidding imprisonment for debt, referred to the cause of action as being *ex contractu,* and thereby implied that imprisonment is not forbidden in every civil action, but may be allowed in actions which are not for debt. *Moore v. Green,* 73 N. C., 394; *Long v. McLean,* 88 N. C., 3. The section was aimed primarily at the law which gave the right of execution against the body of the defendant in civil actions; and if it be granted that it extends to and forbids criminal prosecutions for simple breach of contract, still we are convinced that error was committed in arresting the judgment.

At common law a fraudulent act was prosecuted as a crime only when it was calculated to defraud a number of people, and for this reason statutes were enacted in England to punish a variety of frauds not previously punishable. Some of these statutes, reënacted here, have been united with the body of our criminal law. Section 4277 of Consolidated Statutes, which denounces as a felony the intentional obtaining of property by false tokens or other false pretenses, was derived from 33 Henry VIII, ch. 1, and 30 George II, ch. 24. *S. v. Phifer,* 65 N. C., 321. Under this statute and others similar to it the person defrauded must have parted with something of value, as exemplified by a sequence of opinions from *S. v. Simpson,* 10 N. C., 621, to *S. v. Roberts,* 189 N. C., 93. To this group may be referred the frauds within contemplation of the constitutional provision heretofore set out—a conclusion which, we venture to say, may reasonably be deduced from several of our own decisions. The phrase "in cases of fraud" qualifies the word "debt"; it signifies fraud in making the contract or in attempting to

evade performance by the fraudulent concealment or disposition of property or other fraud devised for the purpose of defeating collection of the debt. In *Melvin v. Melvin,* 72 N. C., 384, "fraud," as used in section 16, *supra,* was defined by *Chief Justice Pearson* as "fraud in attempting to hinder, delay and defeat the collection of a debt by concealing property and other fraudulent devices, fraud in making the contract—false representations for instance, and fraud in incurring the liability, for instance, when an administrator commits a fraud by applying the funds of the estate to his own use, paying his own debts and the like." And in *Moore v. Mullen,* 77 N. C., 327: "It is clear that the words 'except in case of fraud' are evidently used in a very restricted sense, such as fraud in procuring a contract to be made, or fraud in attempting to evade performance—as by concealing property, or by attempting to run it out of the State, or by making a fraudulent disposition of it." See *Powers v. Davenport,* 101 N. C., 286.

It may be conceded that the defendant perpetrated no fraud at the time he engaged the services of his attorneys, and that under the cases last cited he was not culpable in contracting the debt; but this does not imply that a fraudulent act cannot be made punishable as a crime unless it induces or results in simultaneous loss, or that imprisonment for breach of the statute in question is imprisonment for debt, or that the defendant in this action practiced no fraud in giving the check. It is necessary to keep in mind the distinction .between cases in which present loss is caused by fraud in contracting the debt, punishable under the provisions of the English statutes which have been reënacted here, and those in which there is subsequent fraud, disconnected with the inception of the debt and punishable under the general police power of the State. Failure to observe this distinction would conveniently destroy the foundation on which the argument in behalf of the State is based. It would assume that the statute penalizes imprisonment for debt; but this assumption, as we understand the law, would be altogether premature. It would be a fair illustration of a syllogism in which the major premise assumes the fact to be proved. This is the very point upon which there is divergence of opinion—the point, in truth, which *Chief Justice Pearson* thoughtfully clarified. It is difficult to detect in the defendant's execution and delivery of the check any fraud in procuring the contract, making the debt, or evading performance by concealing or disposing of property—elements constituting fraud for which there may be imprisonment for debt. But the recent statute condemns an act which may have nothing to do with incurring the debt or defeating its collection "by concealing property or other fraudulent devices"—an act wilfully done, it may be long after the debt has been contracted, and therefore not within

the purview or contemplation of the constitutional inhibition. It follows, in our opinion, that the statute does not conflict with Article I, sec. 16, of the Constitution.

A crime is an act or omission punishable as an offense against the State. 1 McClain on Crim. Law, sec. 4. Crimes *mala in se* comprise acts which are wrong in themselves, as murder or arson, but acts which are *mala prohibita* are crimes only because they are prohibited by the common law, by statute, or by ordinance. The Legislature, unless restrained by the organic law, has the inherent power to prohibit and punish any act as a crime. 16 C. J., 60. In *Halter v. Nebraska*, 205 U. S., 34, 51 Law Ed., 696, 701, the Court in treating the subject expressed this conclusion: "Another vital principle is that, except as restrained by its own fundamental law, or by the supreme law of the land, a State possesses all legislative power consistent with a republican form of government; therefore each State, when not thus restrained, and so far as this Court is concerned, may, by legislation, provide not only for the health, morals and safety of its people, but for the common good, as involved in the well-being, peace, happiness and prosperity of the people."

We recognize the principle that the police power may not be exercised in breach of rights which are guaranteed by the Constitution of the State or Nation; but if, as we have said, the assailed statute is not in conflict with the fundamental law its enactment was a lawful exercise of legislative power. The police power is a necessary attribute of every civilized government; it is not a grant derived from or under any written constitution, but it is inherent in the several States. It is but "another name for that authority which resides in every sovereignty to pass all laws for the internal regulation and government of the State," and by means of it "the Legislature exercises a supervision over matters involving the common weal and enforces the observance by each individual member of society of the duties which he owes to others and to the community at large." 6 R. C. L., 183, sec. 182; 185, sec. 184. So we have held that by virtue of the police power the law-making body may enact laws for the enjoyment of private and social life, the beneficial use of property, the security of the social order, and the prevention and punishment of injuries, as well as for the protection of the life, safety, health, morals, and comfort of the citizen. *S. v. Vanhook*, 182 N. C., 831. This attribute of sovereignty imports authority, not only to punish an injury which has become a public nuisance, but to punish fraudulent acts which tend to deceive, to destroy confidence, and to injure the public interests. Does the giving of worthless paper tend to deceive? Does the custom of putting it in the market places tend to

destroy confidence? The transaction of business is dependent on credit; the basis of credit is confidence. The harmful effect of flooding the channels of commerce with checks and drafts of this character is manifest; it is not restricted to the bare transaction between the maker and the payee; its scope embraces the endorsement and the unrestrained transfer of the paper, releasing it as "a courier without baggage" hastening perchance to the four corners of the country. The offense consists, not in presently obtaining something of value by deceit, but in putting in circulation worthless commercial paper which will ultimately result in financial loss. If we close our eyes to this significant fact we shall fall into the patent error of trying to apply to the case before us the law as announced upon an entirely different state of facts in such cases as *S. v. Griffin,* 154 N. C., 611, and *Minton v. Early,* 183 N. C., 199.

True, this Court has never held that the mere giving of a worthless check or draft is a breach of the criminal law. The constitutionality of C. S., 4283, or Public Laws 1925, ch. 14, now repealed, has never been determined. *S. v. Edwards,* 190 N. C., 322; *S. v. Corpening,* 191 N. C., 751. But the act of 1927 comprises much more than the giving of worthless paper. The offense is complete only when a check or draft is made or drawn, etc., on any bank or depository for the payment of money or its equivalent by one who *knows* at the time that he has not sufficient *funds in or credit with such bank or depository* with which to pay the paper when presented—"credit" meaning an arrangement or understanding with the bank or depository for the payment of the check or draft.

Can it be said that the issuance of a check or draft under these circumstances is not a false representation of a subsisting fact—the wrong which the statute condemns? Can the maker condone his act on the theory that he did not mean what he said? By the act of issuing the paper does he not aver the existence of funds or credit against which it is drawn? Can a fraudulent act be defined only by the use of the word "fraud"? We have understood the principle to be that in creating an offense the Legislature may define it by a description of the specific act, or as an act which produces or is calculated to produce a described result. 16 C. J., 67. The result contemplated is financial loss. If there be no immediate loss the probability of ultimate loss is sufficiently imminent to warrant the exercise of the police power in behalf of the public good.

A statute almost identical with ours was construed by the Kansas Supreme Court in *S. v. Avery,* 23 A. L. R., 453. There the first count of the information was based on a check to the Dodge City Wholesale Grocery Company for $133.44. To this count the defendant pleaded

guilty and moved in arrest of judgment on the ground that the count did not state facts sufficient to constitute a public offense. The motion was denied and on appeal the ruling was affirmed, the Court saying: "The worthless check must be wilfully drawn, knowing at the time there are no funds on deposit to meet it. Beyond that, the Legislature may, for protection of the public interest, require persons to act at their peril, and may punish the doing of a forbidden act without regard to the knowledge, intention, motive or moral turpitude of the doer. There is no constitutional objection to such legislation, the necessity for which the Legislature is authorized to determine."

With respect to the question of imprisonment for debt it was said: "The defendant contends the statute is in conflict with paragraph 16 of the Bill of Rights, which forbids imprisonment for debt except in case of fraud. It is said the check was given to pay an acknowledged debt, long past due, and neither debtor nor creditor made or lost anything, but the debtor must be imprisoned because the debt was not discharged by the check. The information does not disclose the consideration for the check. It may be conceded, however, the statute applies to a transaction of the character described. Nevertheless, the statute does not impose imprisonment for debt. This subject was considered by the Supreme Court of Georgia, in the case of *Hollis v. State,* 152 Ga., 182, 108 S. E., 783. The Constitution of the State of Georgia declares 'there shall be no imprisonment for debt.' The Worthless Check Act of 1919 resembles the statute of this State, except that the check must be drawn with intent to defraud. The Court said the drawer of the check is not imprisoned for debt, but for fraud, and cited the case of *Smith v. State,* 141 Ga., 482, 81 S. E., 220, Ann. Cas. 1915 C, 999. In the cited case, the Court had under consideration the act designed to punish fraudulent practices in obtaining board, lodging, and other accommodation at hotels, inns, boarding houses, and eating houses, and held imprisonment was not imposed for debt, but for the forbidden practices. Under the statute of this State, the offense does not consist in nonpayment of debt, but in resorting to a practice which the Legislature regarded as demoralizing to business." See *S. v. Torrence,* 127 N. C., 550.

The conclusion was that the offense was not committed against the payee of the check only, but consisted in the public nuisance resulting from the practice of putting worthless paper in circulation. This, it would seem, is the accepted position. In the annotation following the case, it is said: "Apparently very few cases have passed directly upon the constitutionality of statutes making it a criminal offense to issue a check without funds to meet it; but the decisions which have been found

STATE v. YARBORO.

all upheld such statutes against such constitutional objections as have been made." The decision (it was said) that the wrong need not have resulted in immediate loss rests upon the theory that for the protection of the public interest the Legislature may require persons to act at their peril and may punish the doing of a forbidden act without regard to moral turpitude. Annotation, *S. v. Avery, supra.*

Many of the cases on which the appellant relies construe statutes in which by express words the criminal intent is required to be shown; our statute has no such requirement; it provides that the making or the issuing of a worthless check or draft by a person who knows that it is worthless is itself an act of such potential evil as to demand its suppression by the exercise of the police power which is inherent in the State. Statutes manifesting an exercise of this power have defined as misdemeanors a variety of acts performed without regard to a specific criminal intent. See C. S., 4429, 4466, 4467, 4709, 4737, 6648; *S. v. Yopp,* 97 N. C., 477; *S. v. Moore,* 113 N. C., 698; *Shelby v. Power Co.,* 155 N. C., 196.

It is possible, of course, to depict evils which may spring from the statute and to overlook those which may result from a deluge of valueless commercial paper; but we must assume that the probable effects of the statute were apprehended by the law-making body from which it derived its vitality. Indeed, in the preamble to the statute the evils already experienced are declared to be "the circulation of worthless paper, overdrafts, bad banking, check kiting, and a mischief to trade and commerce."

Bills of exchange are now regarded as representing so much money and as performing the functions of paper currency. They are an indispensable agency in the maintenance of commerce; and in the proportion in which they are spurious the expansion of trade will unavoidably be retarded. These instruments of business intercourse should command public confidence. We are not at all inclined to predict the ultimate effects of the pernicious practice to which we have referred, but it may not be unwise to bear in mind Macaulay's observation in reference to the "clipped coin of the realm": "When the great instrument of exchange became thoroughly deranged, all trade, all industry, were smitten as with a palsy." His. Eng., Vol. 5, page 87. The judgment is

Reversed.

STACY, C. J., concurring: The uttering of a worthless check, *scienter,* is both a private and a public wrong, like the passing of a counterfeit coin. And herein lies the distinction between the case at bar and *S. v. Griffin,* 154 N. C., 611, which arose under C. S., 4281, a statute purport-

ing to make it unlawful for a tenant wilfully to fail to carry out his agreement with the landlord, after obtaining advances under promise to work, etc., and *Minton v. Early,* 183 N. C., 199, which arose under C. S., 4480, a statute purporting to make it unlawful for a tenant wilfully to abandon his crop, etc.

The present statute is aimed at a practice which has become a menace to trade, an evil and a mischief in the field of commerce, where the major portion of business is done on paper. A check is a negotiable instrument and passes readily through the channels of commerce because of the faith and confidence which those in the market-places are willing to repose in its maker, and it is a crime, an injury to society, to undermine, in any degree, the very foundation upon which all credit rests. It is to the welfare of the State that such faith and confidence should be encouraged rather than destroyed. And so the statute is written.

"A check is a bill of exchange, and may more particularly be defined as a written order on a bank or banker, purporting to be drawn against a deposit of funds, for the payment, at all events, of a sum of money to a certain person therein named, or to him or his order, or to bearer, and payable on demand"—*Walker, J.,* in *Trust Co. v. Bank,* 166 N. C., p. 118.

It is not only a wrong to the payee, but also an injury to the public, for a person to draw a check on a bank, or other depository, and deliver it to another, intending thereby to make a payment of money or its equivalent, knowing at the time that he "has not sufficient funds on deposit in or credit with such bank or depository with which to pay the same upon presentation" (an important provision of the statute), and it is the avowed purpose of the Legislature to put an end to the practice. It is not the attempted payment of a debt that is condemned, but the giving of a worthless check and its consequent disturbance of business integrity. That the Legislature has the power to enact the law, may not be altogether free from difficulty, nevertheless, the doubt, if any, it seems to me, should be resolved in favor of the validity of the statute. *S. v. Revis,* 193 N. C., 192. It certainly is good morals and I think it is good law.

The "check flasher" does a great deal more than contract a debt; he shakes the pillars of business; and, to my mind, it is a mistaken charity of judgment to place him in the same category with the honest man who is unable to pay his debts, and for whom the constitutional inhibition against "imprisonment for debt, except in cases of fraud" was intended as a shield and not a sword.

In *S. v. Torrence,* 127 N. C., 550, the act of 1879, section 1027 of The Code, now C. S., 4282, which provides that if any person shall obtain

advances on a written representation that he is the owner of specific personal property, which he agrees to apply to the payment of said advances, and .fails to do so, shall be guilty of a misdemeanor, and punishable, was upheld against an attack upon the ground that it was in conflict with the provision of the Constitution, forbidding imprisonment for debt except in cases of fraud, the court saying: "It is not the failure to pay the debt which is made indictable, but the failure to apply certain property which, in writing, has been pledged for its payment, and advances made on the faith of such pledge." The present statute stands on the same footing.

The mere drawing and delivery of a check to a third person, without more, is equivalent to a representation that the drawer has funds or credit in the bank, sufficient to insure payment on presentation, and if known to be untrue, is a false pretense. Note, 17 L. R. A. (N. S.), 244, citing many cases; Note, Ann. Cas., 1916 E, 736. This is the practice against which the statute is aimed.

The issuing of a check on any bank or depository, for the payment of money or its equivalent, when the maker or drawer knows that he has not sufficient funds on deposit in, or credit with, such bank or depository with which to pay the same upon presentation, if done with intent to defraud, would involve moral turpitude and may justly be called *malum in se*. In the absence of an intent to defraud, it may not be *malum in se;* but where the statute makes such an act a misdemeanor, regardless of the intent, other than the intent to do the act forbidden, it is *malum prohibitum,* and I think within the power of the Legislature to enact.

A wilful purpose, or an evil intent, is indispensable to a conviction of a crime which is morally wrong. But no evil intent is essential to an offense which is a mere *malum prohibitum*. The will to do the act forbidden by the statute is the only criminal intent requisite to a conviction of a statutory offense which is not *malum in se. S. v. McBrayer,* 98 N. C., 619; *Armour Co. v. U. S.,* 153 Fed., 1, affirmed, 209 U. S., 56; 16 C. J., 76; I Bish. Cr. Law (9th ed.), sec. 206a.

It can make no difference whether we, as individuals, think ill or well of the manner in which the Legislature has dealt with a given subject, for, so long as the law-making body stays within the bounds of the Constitution, its acts are free from judicial interference. *Muskrat v. U. S.,* 219 U. S., 346. It is only when the General Assembly exceeds the grant of legislative authority, made to it in the organic law, or disregards one or more of the inhibitions contained therein, that the courts are directed to restrain its action. *Person v. Doughton,* 186 N. C., p. 725.

The courts are limited to the exercise of judicial power by the same instrument which limits the Legislature to a given field of operation.

R. R. v. Cherokee County, 177 N. C., 86. Unconstitutional acts of the Legislature may be rendered harmless by the courts in individual cases, when properly presented, but for the courts to strike down valid acts of the Legislature would be wholly repugnant to, and at variance with, the genius of our institutions. For this reason, every presumption is indulged in favor of the validity of an act of the law-making body. Adkins v. Children's Hospital, 261 U. S., 525.

True; the Constitution is not to be honored in form and disregarded in substance. "But the same rule of construction which commands that effect should be given to the constitutional will of the people, to its full extent, without regard to verbal subtleties, equally forbids that we should interpolate into the Constitution what the people did not will, by an artificial and technical stretching of their language beyond its ordinary, popular and obvious meaning"—Gaston, J., in S. v. Manuel, 20 N. C., p. 154.

It may not be amiss to observe, in passing, that the statute is not as all-embracing, nor is the opinion of the Court as far reaching, as some of the illustrations made, and fears expressed, in the defendant's behalf.

I concur in the judgment of the Court holding the present enactment to be within the constitutional power of the Legislature.

CONNOR, J., concurring : The only question presented for our decision by the appeal in this case, is, whether the General Assembly of this State has the power to declare, by statute, that "it shall be unlawful for any person, firm or corporation to make, draw, utter, or issue and deliver to another any check or draft on any bank or depository for the payment of money or its equivalent, knowing at the time of making, drawing, uttering, issuing and delivering such check or draft as ·aforesaid, that the maker, or drawer thereof, has not sufficient funds on deposit in, or credit with such bank or depository with which to pay the same upon presentation," and to prescribe that "any person, firm, or corporation violating any provision of this act shall be guilty of a misdemeanor."

The policy or impolicy of this statute is, manifestly, not for the consideration of this Court. Our jurisdiction, which is derived from and limited by the Constitution of this State (Art. IV, sec. 8) does not extend to or embrace matters of policy, these being exclusively within the power of the General Assembly, with whom all legislative authority is vested (Art. II, sec. 1) subject only to restrictions imposed by the people of North Carolina, in the State Constitution and by the people of the United States in the Federal Constitution. S. v. Revis, 193 N. C., 192; S. v. Lewis, 142 N. C., 626. It is only when the General Assembly undertakes to exceed its legislative authority as restricted by the Constitution,

STATE *v.* YARBORO.

either of the State or of the United States, that this Court has or assumes jurisdiction to adjudge its statutes invalid for want of power to enact the same.

In these instances, which have been rare, it is within the power as well as the duty of this Court to exercise its jurisdiction, and thus to perform one of the highest and most delicate functions of the judicial department of a government founded upon a written Constitution. *Person v. Doughton,* 186 N. C., 725. In the rare instances in which this Court has been called upon to perform this function, it has ever been mindful of the words of *Gaston, J.,* in his opinion, written in 1838, in the case of *S. v. Manuel,* 20 N. C., 144. The question presented for decision in that case was the same as that which we are now called upon to decide. He says: "Every case seriously questioning the constitutionality of a statute is entitled to the most deliberate consideration, because it invokes the exercise of the highest and most delicate function which belongs to the Judicial Department of the Government. The case before us not only seriously raises this question, but raises it upon grounds so plausible at least, if not so strong, as to render a full examination of them a task of some difficulty. We have therefore felt it our duty to examine the question with diligence and care, and if the conclusion to which we have arrived be not right, the error will not have resulted from the omission of our best efforts to form a correct judgment." This task has been so well and fully performed for the Court by *Justice Adams* in this case that but little remains to be said in support of our decision. But for the vigor with which our brethren, who find themselves unable to concur in the decision, support their dissents, and but for the earnestness with which they express their views, I should be content to say no more, confident that our decision is fully supported by the authorities, and is in full accord with well-settled principles of law.

The power of the General Assembly, in the exercise of its legislative authority, to prohibit by statute an act or acts, therein defined as a crime, and to prescribe punishment for the violation of such statute, is inherent. 16 C. J., p. 60, sec. 14. Such power is limited, with respect to any particular statute and also with respect to the punishment to be inflicted upon one who violates the same, only by constitutional restrictions. Wherever by reason of changes in social conditions, the General Assembly deems an act or acts, theretofore not prohibited by statute, hurtful to the public, and mischievous in effect, it not only has the power, but it is its manifest duty to declare such act or acts unlawful, and to prohibit the doing of the same by statute, in which punishments are prescribed for its violation. It is provided in the Constitution of this State that in order that grievances may be redressed, and the laws amended and strengthened, elections shall be often held (Art. I,

sec. 28) and that the General Assembly shall meet in regular session, biennially. These provisions are in accord with a sound principle of government. Reference to chapter 82, of the Consolidated Statutes of 1919, entitled "Crimes and Punishments," and amendments thereto, and to the Public Laws, since enacted and published, will disclose that the General Assembly has exercised this power, and performed this duty. Many acts are now defined as crimes and punished as such, which under social conditions which formerly obtained in this State, were done with impunity. But for this power which the General Assembly exercises in its best judgment, with ultimate responsibility only to the people of the State, the criminal law would be static, and not progressive, as it is and should be.

It is said, however, that the General Assembly was without power to enact chapter 62, Public Laws 1927, entitled "An act to prevent the giving of worthless checks," because the enforcement of said statute against one who shall violate its provisions, will result in imprisonment for debt, contrary to the provisions of section 16 of Article I of the Constitution, which declares that "there shall be no imprisonment for debt ·in this State, except in cases of fraud." It is conceded, of course, that the word "fraud" does not appear in this statute. If, however, the validity of the statute depends upon whether it shall be construed as requiring that a fraudulent intent be proved before there can be a conviction, and punishment by fine or imprisonment (C. S., 4173, *S. v. Manly,* 95 N. C., 661), this objection is not upon sufficient grounds to require us to hold that the statute is void. The act which is made unlawful, and defined as a misdemeanor, is the giving of a check, with knowledge at the time of giving, that the drawer has not sufficient funds on deposit in or credit with the bank for the payment of the same. A check is defined in *Trust Co. ·v. Bank,* 166 N. C., 112, in the opinion of *Walker, J.,* as "a written order on a bank or banker, purporting to be drawn against a deposit of funds, for the payment, at all events, of a sum of money to a certain person named therein, or to him or his order, or to bearer, and payable on demand." A check is a bill of exchange drawn on a bank, payable on demand. C. S., 3167. It is, on its face and by its very nature, a representation to every person who may take it or deal with it, as payee, endorsee or holder, that funds have been provided by deposit or by credit with the drawee bank, for its payment on presentation. In law, as well as in every-day business, there is a representation, not only that the drawee bank will pay the check upon due presentation, but also that funds are in its hands; or that credit has been arranged with it, for such payment. The representations, express or implied, made by the drawer of a check on a bank or banker include more than the representations made by the drawer of a draft on a drawee, who is not

a bank or banker; the latter engages with the payee and successive holders only that the draft will be accepted or paid, or both, by the drawee, while the former represents that he has funds with the drawer out of which the check will be paid, at all events. While there is no distinction in the ultimate liability of the drawer of a check on a bank, or banker, and the drawer of a draft upon one who is neither, there is a distinction, recognized in the business world between the representations made by such drawers. The statute involved in this action recognizes this distinction, and it may well be held that in prescribing punishment by fine or imprisonment for its violation, it comes within the exception to the principle contained in section 16 of Article I of the Constitution. There can be no conviction, resulting in punishment by imprisonment, for the violation of this statute, without proof, not only that the accused gave the check, but also that he knew that the representation that he made thereby was false. The giving of the check with such knowledge is a fraud for which a defendant in a criminal action, who has been duly convicted, may be punished by imprisonment, without impinging upon the sound and just principle stated in section 16 of Article I of the Constitution.

This principle was included in our bill of rights, and has remained therein, not as a limitation upon the power of the General Assembly with respect to the enactment of criminal statutes, with adequate provisions therein for the punishment of those who violate them, but for the purpose of prohibiting the issuance of executions against the person, as allowed at common law, upon judgments recovered by creditors against debtors. It was the evil flowing from the issuance of such executions that the people of North Carolina thereby declared should cease. At common law executions in actions where money only was recovered as a debt or damages for the breach of a contract, were of five sorts: (1) against the body of the defendant; (2) against his goods and chattels; (3) against his goods and the profits of his land; (4) against his goods and the possession of his land; and (5) against all three, his body, land and goods. Blk. Com. Vol. III, ch. XXVI. The first of these executions was by writ of *capias ad satisfaciendum.* This latter writ is said by Blackstone to be an execution of the highest nature, inasmuch as it deprives a man of his liberty till he makes the satisfaction awarded. By means of this writ, a debtor could be imprisoned at the instance of his creditor. Notwithstanding section 39 of the Constitution of North Carolina, adopted in 1776, such an execution was allowed in this State prior to 1868. However, since the adoption of the Constitution of 1868, containing section 16 of Article I, no judgment creditor has had the power to procure the arrest and imprisonment of his debtor by an execution against his person, on a judgment for debt arising out of contract, unless

fraud was alleged and proved, with respect to the debt. Statutes have been enacted by the General Assembly and are now in full force in North Carolina, guaranteeing unfortunate debtors that they shall not be imprisoned solely because they are unable to pay their debts. In my opinion, no criticism can be justly made of the General Assembly of 1927, here or elsewhere, for that they have violated a fundamental provision of our bill of rights, by the enactment of chapter 62, Public Laws 1927. This statute, as is now held by this Court, is valid. It was enacted by the General Assembly in the exercise of its legislative authority for the protection of the public from an evil which it declared has arisen in North Carolina by reason of modern methods of doing business. The power of the General Assembly to enact the statute is not within the restrictions imposed thereon by constitutional provisions. I concur in the decision upon the question presented to the Court by this appeal.

BROGDEN, J., dissenting: This case has been considered with great deliberation by the Court, but I find that my mind cannot reach the conclusion set forth in the opinion nor approve the reasoning through which the result is achieved. The Constitution of North Carolina, Article I, sec. 16, provides "that there shall be no imprisonment for debt in this State, except in cases of fraud." The reverse of the proposition is that there can be imprisonment for debt in this State "in cases of fraud." At the outset, therefore, the inquiry is, what is the meaning of the constitutional expression "in cases of fraud"; or to state the proposition differently, what is the meaning of fraud as contemplated by the Constitution, which will warrant and justify depriving a citizen of his liberty?

Fraud, as contemplated by the Constitution, has not been left to conjecture or supposition. Shortly after the instrument was forged and while hot and fresh, this Court interpreted and set in legal concrete the meaning of fraud as contemplated therein. *Pearson, C. J.,* writing in *Moore v. Mullen,* 77 N. C., 328, says: "And it is clear that the words 'except in cases of fraud' are evidently used in a very restricted sense, such as fraud in procuring a contract to be made; or fraud in attempting to evade performance—as by concealing property, or by attempting to run it out of the State, or by making a fraudulent disposition of it." The same definition was given by *Chief Justice Pearson* in *Melvin v. Melvin,* 72 N. C., 384.

Let it be observed that the definition of fraud as contemplated by the Constitution is not a mere sugar-coated and emasculated misrepresentation, but fraud "in a very restricted" sense in either procuring a contract or evading performance in the manner specifically pointed out by

33—194

STATE *v.* YARBORO.

*Chief Justice Pearson.* If, then, these decisions correctly state the law and are to be considered binding, then the absence of such fraud is fatal to imprisonment for debt.

As I conceive the law, the identical proposition, in principle, was decided in *S. v. Griffin,* 154 N. C., 611. The statute under consideration in that case carried the words "with intent to cheat and defraud another . . . shall obtain any money, etc., from any other person . . . by color of any promise or agreement that the person making the same will begin any work, etc., and shall unlawfully and wilfully fail to commence or complete said work according to the contract, without a lawful excuse, he shall be guilty of a misdemeanor." The statute was amended to provide: "And evidence of such promise or agreement to work, the obtaining of such advances thereon and the failure to comply with such promise or agreement shall be presumptive evidence of the intent to cheat and defraud," etc. The opinion of the Court declares: "It is a part of the organic law of this State that there shall be no imprisonment for debt except in cases of fraud. The bald fact that a person contracted a debt and promised to pay it in work, standing alone, does not justify a presumption of fraud in contracting the original debt, any more than it would if he had promised to pay it in money. It is beyond the power of the Legislature to create such a rule of evidence and enforce it in the State's own courts. It is but an arbitrary mandate, there being no rational connection, tending to prove fraud, between the fact proved and the ultimate fact presumed. Such an arbitrary rule of evidence takes away from the defendant his constitutional rights and interferes with his guaranteed equality before the law, and, as the Supreme Court of the United States says, 'violates those fundamental rights and immutable principles of justice which are embraced within the conception of due process of law.'" To the same effect is the utterance of *Hoke, J.,* in *Minton v. Early,* 183 N. C., 199. "But, in our opinion, the statute referred to, imposing as it does punishment of fine and imprisonment for abandoning a tenancy or crop, without paying for the advances made by the landlord, and without requiring any allegation or proof of fraud, either in the inception or breach of the contract, is in violation of our constitutional provision, Art. I, sec. 16, which inhibits 'imprisonment for debt except in cases of fraud.'"

However, the opinion of the Court says: "The offense consists not in presently obtaining something of value by deceit, but in putting in circulation worthless commercial paper which will ultimately result in financial loss. If we close our eyes to this significant fact, we shall fall into the patent error of trying to apply to the case before us the law as announced upon an entirely different state of facts in such cases as

*S. v. Griffin,* 154 N. C., 611, and *Minton v. Early,* 183 N. C., 199." According to this proposition, the crime consists of two elements, to wit: (1) Issuing and delivering a worthless check; (2) ultimate financial loss.

A check by its very nature is an evidence of indebtedness and as between the drawer and payee, the equivalent of the drawer's promise to pay. A worthless check is then at most a false promise or a false representation. Now what was the gist of the offense in the *Griffin case?* (1) Procuring something of value. (2) By a false promise or false representation, to wit, to begin work for the promisee, and (3) immediate financial loss. Although there was a false promise or false representation resulting in immediate financial loss, this Court held the legislation unconstitutional. Yet in the present case a false promise or false representation resulting in hypothetical financial loss, even though nothing of value was procured or received at the time of the uttering thereof, is held valid and constitutional.

I am inclined to think that the "patent error" referred to in the opinion of the Court consists in the failure to recognize what the politicians might term, the "deadly parallel" between the *Griffin case* and the case at bar.

But says the Court: "Can it be said that the issuance of a check or draft under these circumstances is not a false representation of a subsisting fact—the wrong which the statute condemns?" "False representation of a subsisting fact" is false pretense. If so, the statute is a useless legislative performance because C. S., 4277, defining and punishing that crime, is already in full force and effect. Again, if false pretense is "the wrong which the statute condemns" then it must be an essential element of the crime, and, if so, it ought to be alleged in the indictment and proved at the trial. The statute itself, however, contains no language specifying either false pretense or fraud. Is it not therefore apparent that the Court by construction and interpretation is thrusting into the statute the necessary legal elements, and thereby forging and fashioning a totally new law?

If the bad-check law really means that a person who issues and delivers a worthless check is actually guilty of false pretense, then why not so declare and require the State to allege and prove the commission of the real crime for which a defendant is to be tried? Ought a citizen of this State to be convicted of a false pretense without requiring the essential elements of the crime to be established? If so, the law itself sets the example of subterfuge in its own tribunals.

However, it is contended that the bad check law can be upheld upon two grounds:

1. That imprisonment for debt is not involved, but the giving of a worthless check, which is a separate and distinct criminal act.

2. That such legislation can be supported and justified under the police power.

In discussing the first contention, it must be borne in mind that the facts in this case show that the check for $100 was given to pay a debt then existing. Nothing of value, so far as the record discloses, passed to the defendant at the time of giving the $100 check. While it is debatable in my mind, under our decisions, as to whether the receiving of value at the time of giving the check and upon the faith of the check, is not essential to uphold conviction, still it must be apparent that in this particular case the debt lies upon the threshold of the indictment.

What is the meaning of the expression "for debt"? The word "for" is generally understood in law to mean "on account of;" or "growing out of." Words and Phrases, Second Series, Vol. 2. In the light of this definition, Art. I, sec. 16, of the Constitution would read substantially as follows: "There shall be no imprisonment on account of or growing out of a debt in this State, except in cases of fraud."

Does the transaction for which the defendant is indicted "grow out of" a debt or arise "on account of" a debt? Suppose the defendant had written a dozen checks and passed them out to his friends to whom he was under no legal obligation, would anybody contend that the mere drawing and delivering of these checks constituted a crime for which he would be imprisoned? I think not. What is it then that creates the crime? Obviously the drawing and delivering of the check to a creditor. The debt, therefore, becomes the foundation of the offense. It is the breath of life to the crime, and without it the crime could not exist. The debt and the crime are as closely associated as bone and marrow or lungs and breathing. Neither can function without the other. So that the effort to insert the judicial operating knife between these two inseparable facts, each giving life and vitality to the other, is to my mind, simply "dividing a hair twixt South and Southwest side." Let it be borne in mind, too, that as a result of this infinitesimal division, a citizen can be deprived of his constitutional liberty, which, under all established principles of law, is entitled to every reasonable inference in its favor.

It could have been argued with equal, if not greater force, in the *Minton case* that the penal statute was not intended to make a tenant pay for advances, but to punish an entirely separate and distinct offense, to wit, that of abandoning a crop and subjecting the landlord to financial injury through the probable loss of the crop. Moreover, the same reasoning could have been applied with greater force to the *Griffin case* upon the theory that the statute was not intended to imprison a tenant for debt, but to punish his gypsy propensities in wandering about the

country, abandoning crops to the mercy of wind and weather and thus subjecting the landlord to probable financial loss, and establishing a practice destructive of agriculture.

The principle of *scienter* cannot save the day. *Scienter* is a technical term denoting in the law of fraud a guilty knowledge, and so far as I can discover, is confined to the field of civil actions for fraud and has never been used as a substitute for that evil intent of the mind upon which all crime rests. Indeed in a civil action for fraud the fraudulent intent is an essential to liability. In the very last utterance of this Court upon the subject in *Corley Co. v. Griggs*, 192 N. C., 173, *Clarkson, J.*, writing for the Court, quoting from Pollock on Torts, says: "To create a right of action for deceit there must be a statement made by the defendant, or for which he is answerable as principal, and with regard to that statement *all the following conditions must concur* (italics mine) : (a) It is untrue in fact. (b) The person making the statement, or the person responsible for it, either knows it to be untrue, or is culpably ignorant (that is, recklessly and consciously ignorant) whether it be true or not. (c) It is made to the intent that the plaintiff shall act upon it, or in a manner apparently fitted to induce him to act upon it. (d) The plaintiff does act in reliance on the statement in the manner contemplated or manifestly probable, and thereby suffers damage." Thus it appears that *scienter* alone without the fraudulent intent does not even establish a cause of action in a civil case, and yet it is held to be sound law in the case at bar that mere *scienter* without the intent to deceive is sufficient to establish a crime. In other words, the natural order of the law is reversed and a crime can be established upon less proof than a cause of action in a civil case.

Nor will the analogy of the "clipped coin of the realm" avail. Clipping the coinage or counterfeiting is not now and never has been a crime growing out of or connected with a debt or in anywise possessing any relationship whatever to a contractual obligation. Neither can the doctrine of *malum prohibitum* control, for the plain reason that the Legislature has no power to declare the failure to pay a debt *malum prohibitum*, and thus by indirection nullify the plain guarantee of the Constitution.

Again, the bad check law, as drawn, does not even establish a tort. If the prosecuting witness in this case had sued the defendant upon the check, alleging in the words of the statute that the defendant gave him the check "knowing at the time that he had no funds in bank to pay the same upon presentation," and then should submit an issue to the jury in the words of the statute, "did the defendant give said check 'knowing at the time' that he did not have sufficient funds on deposit to pay

same"? and the jury should answer this issue yes, I assume that there is not a judge in the State who would sign a judgment in the action, decreeing the arrest of the person of the defendant. And yet, by the simple device of turning the guns of the criminal law upon either a crooked or unfortunate debtor, irrespective of good faith, he can be sent to the chain-gang for a transaction for which he could not even be arrested in a civil case. This result sweeps away all the landmarks set by our fathers establishing the boundaries of constitutional liberty, and I cannot believe that it is sound law.

The second ground upon which this legislation is sought to be upheld is through the exercise of police power. It must be conceded that the police power is an indefinable, intangible, illusive and elusive, all-covering mother-hubbard of the law. Under the complex conditions of modern society, where rights and duties overlap and interlock the police power is an essential attribute and function of sovereignty, subordinating individual convenience and individual rights to the dominant welfare of the public. But, however potent the police power may be, it is not superior to the Constitution, and when the Constitution speaks it must hold its peace. If the bad check law is unconstitutional, that ends the controversy and there can be no police power involved. Obviously the police power cannot push the Constitution from its throne as the supreme authority in this State, because the police power must be treated as the handmaid of the Constitution and not an indirect device, undermining and overthrowing the highest expression of the organic law.

It is to be noted that the opinion of the Court declares that "we recognize the principle that the police power may not be exercised in breach of rights which are guaranteed by the Constitution." But a perusal of the opinion will clearly disclose that while the principle may be recognized it is not applied because one of the main theories for upholding conviction rests upon the exercise of police power in suppressing a *practice* which is supposed to corrupt the morals of the State.

Of course the preamble of the act contains a galaxy of descriptive adjectives, but these mean nothing as the body of the act is plain and unambiguous. These adjectives simply constitute the baby-ribbon, tissue-paper and sprigs of holly which conceal the "Christmas present" contained in section 1 of the act.

The question which we are considering has been considered in many other jurisdictions, notably South Carolina, Vermont, Georgia, California, Ohio, Arizona, Kansas, Florida, Washington, Louisiana, Maryland, Oklahoma, New York and South Dakota. *S. v. Moore* (S. C.), 122 S. E., 672; *Lowell v. Eaton* (Vt.), 122 Atl., 742; *Berry v. State* (Ga.), 111 S. E., 669; *People v. Khan* (Cal.), 182 Pac., 803; *S. v.*

*Lowenstein* (Ohio), 142 N. E., 897; *S. v. Meeks* (Ariz.), 247 Pac., 1099; *S. v. Avery* (Kansas), 207 Pac., 838; *Wolfe v. State* (Fla.), 79 Southern, 449; *S. v. Pilling* (Wash.), 102 Pac., 230; *S. v. Alphonse* (La.), 98 Southern, 430; *Lyman v. State* (Md.), 109 Atlantic, 548; *Kilgore v. State* (Okla.), 219 Pac., 160; *People v. Siman* (N. Y.), 197 N. Y. S., 713; *S. v. Taylor,* 44 S. Dak., 335. There is also an interesting note on the subject in the N. C. Law Review of December, 1926, and also an article on imprisonment for debt in North Carolina, 1 N. C. L. Rev., 229. The statutes of all the States referred to, except Kansas, Vermont and South Dakota, contain the words "with intent to defraud" or similar language.

The South Dakota statute contains the words "every person who designedly by color or aid of any false token or writing . . . obtains . . . any money or property is punishable," etc. This statute, of course rests upon the theory of false pretense and applies only to securing something of value at the time the check is given.

In *S. v. Alphonse, supra,* the Louisiana Court said: "In prosecutions under this statute, one of the essential ingredients of the crime is *fraudulent intent.* It is sacramental that an *intent to defraud* be alleged and proved." In the note upon the subject, 23 A. L. R., 459, the author says: "But in *Neidlinger v. State,* 17 Ga. App., 811, 88 S. E., 887, it was expressly held, in direct conflict with *S. v. Avery,* that unless the statute did require such an intent it would be invalid, since it would be an instrument for the collection of debt by the processes of the criminal law, in contravention of sound public policy and of the constitutional provision against imprisonment for debt." Proceeding further the author says: "The cases of *Hollis v. State* (cited in the opinion of the Court) and *S. v. Pilling* do not expressly declare what would be the effect of failure upon the part of the Legislature to make criminal intent an element of the offense, but the inference clearly is that it is the element of fraudulent intent which relieves the statutes of the constitutional objection that they authorize imprisonment for debt."

The South Carolina statute originally did not require the presence of fraudulent intent, but this was added in 1923.

The Georgia Court in *Berry v. State, supra,* referring to the statute in force in that State says: "This act still makes the intent to defraud an essential element of crime defined in this section thereof. Without such intent no crime is committed, and where the evidence introduced by the State negatives the presumption created by this section, there can be no conviction. . . . The evidence for the State disclosing that there was no intent to defraud the payee of any right, property, money,

or other thing of value, the defendant should not have been convicted, although he falsely stated before he gave his check that he had put funds in the bank to meet the same. The court erred in not granting a new trial."

The Vermont statute provides that if a person shall issue a check. "knowing at the time of such making" he has not sufficient funds to pay the check upon presentation shall be liable in action for tort . . . to the person injured thereby and for want of property, the body of the person making . . . such check may be attached."

The Kansas statute is set out in *S. v. Avery, supra.* This case is cited in the opinion of the Court as the controlling authority upon the question. But the Kansas statute also provides that in case a prosecution is begun under the act the defendant may have the action abated by showing that he had an account in the bank thirty days prior to the time the check was drawn, "and that said check or draft was drawn upon said bank without intent to defraud the party receiving same."

So far as my investigation discloses, there is not a statute in the country upon the subject that does not recognize the intent to defraud as an essential element of the crime, and therefore our act stands alone and unsupported in so far as it purports to deprive a citizen of this State of his liberty upon a bald, bare breach of a simple contract.

Under our bad check law, if a person should give a check for $1,000, which he knew would overdraw his account at the bank five cents, and the payee of the check should present it to the bank, and the bank should decline to pay it, he would be a criminal and a candidate for the chain-gang, even though he intended to make a deposit within five minutes to cover the check and actually had the money to make such deposit.

Again, under this law as written, if the drawer of the check should notify the payee that the check was not good, but that he, the drawer, would make it good within a few minutes, and the payee should present it to the bank for payment and payment should be refused, the drawer would be a criminal under the law of his State. If the check should be post-dated, the same result would follow, for the reason that the opinion of the Court in this case declares in substance that the gist of the offense is giving the check which is dishonored by the bank, irrespective of the circumstances, good faith, or present ability of the drawer of the check to make it good by a deposit in the bank.

Undoubtedly the bad check evil is grievous. But the curbing thereof should be accomplished in obedience to the law of the land. While these evils, like the debased coinage referred to by McCauley, may smite industry "as with a palsy," yet I think that a due recognition and ap-

plication of the constitutional safeguard, in the words of Shakespeare, "makes us rather bear those ills we have than fly to others that we know not of."

I think the act is unconstitutional and therefore a nullity.

If the constitutional provision obstructs the free course of commerce and undermines business confidence and integrity, and is no longer adequate to meet the expanding needs of modern life, then it ought to be repealed and nullified, but this should be done in accordance with law and not by mere judicial construction and interpretation.

CLARKSON, J., concurring in dissent: I concur in the able dissenting opinion of Mr. Justice Brogden. It is not metaphysical reasoning or academic discussion or elaborate subtleties of thought and expression; he stands on the bedrock of our government—the Constitution. Article I, sec. 16, says: "There shall be no imprisonment for debt in this State except in case of fraud." Our form of government is founded on the consent of the governed, subject to constitutional limitations. The individual, elusive views of judge-made law as to what is and what is not police power, has no standing in this forum, when such judge-made power is in direct antagonism of clear language in our Constitution that there shall be no imprisonment for debt except in case of fraud. For nearly sixty years this provision has been a bulwark "as the shadow of a great rock in a weary land" to the poor debtor against the greedy creditor. We need, as never before, in this age of wheels and wings, fast living and extravagance, to get back on the ground of old-time common honesty, but the medicine here is worse than the disease—a term on the chain-gang up to two years or fine in the discretion of the court, for nonpayment of a debt. C. S., 4173. This is the meaning, pure and simple, of this act, in the very teeth of the Constitution. The wise law-writer, thousands of years ago, has written to meet the condition that was known then and would continue through the ages to come, said: "For the poor shall never cease out of the land; therefore I command thee, saying, Thou shall open thine hand wide unto thy brother, to thy poor, and to thy needy, in thy land."

It is well settled in this State that the "check flasher" can be punished. It is he who obtains at the time money or other things of value and gives a worthless check "with intent to cheat and defraud another." C. S., 4283; S. v. Freeman, 172 N. C., 925. In cases of this kind, all the elements of deceit and fraud must be proven. This has been the universal and accepted law here and elsewhere.

The United States Supreme Court, in the well known case of Bailey v. State of Alabama, 219 U. S., 219, holds: "Although a state statute in

terms be to punish fraud, if its natural and inevitable purpose is to punish crime for failing to perform contracts of labor, thus compelling such performance, it violates the Thirteenth Amendment and is unconstitutional."

The only statute in this country that has some semblance to the present statute is Kansas—construed in *S. v. Avery,* but even that statute gives a merciful day of grace. Section 3 provides upon prosecution before trial the action can be abated by showing that he had an account in the bank on which the check was drawn 30 days prior to the delivery of the check, *"and that said check or draft was drawn upon said bank without intent to defraud the party receiving same."*

North Carolina is first in many notable and laudable things; now this mother and protector of all her people, by the majority opinion, stripped of verbiage, it is made a crime, contrary to the constitutional inhibition, not to pay a debt. Let us analyze. The check-flasher is now punished, and rightly so. He obtains a thing of value by fraud. The present act admittedly is for the purpose of collecting by imprisonment, or threat of such, a past due obligation because it is represented by a *check* or *draft.* It is said, in *Markham v. Carver,* 188 N. C., at p. 629, when the fundamental constitutional question, due process of law, arose of taxation without *notice* or *hearing,* "We would be blinded like Samson and perhaps some day pull the pillars of the house down to fall on the poor as well as the rich." In that case, it was about to tumble on the rich, and this Court stayed the hand; now it is about to tumble on the poor. It should tumble on neither. The fathers of the Republic required the oath of office, in part, "do equal right to the poor and the rich." This act primarily affects the debtor, the creditor is the beneficiary.

It is conceded by all that if a thing of value at the time it is obtained, a check, or draft, is given with "intent to cheat and defraud" without providing funds in or credit with the bank on which the same is drawn, that this is a crime, and punishable. The party practically steals from a person his personal property and rightly should be punished. But this act is what? A person buys a suit of clothes or other things of value, the seller gives him credit and time to pay it, as is done every day. In fact often, as is right, to sell the merchandise, persuades the person to purchase. It goes without saying an honest person should pay the debt. It so happens, desiring to pay it, he gives a check or draft to the seller, knowing that he has "not sufficient funds on deposit in or credit with such bank" to pay the same. He then becomes a criminal for giving a check or draft for past due indebtedness. The very fact that he gives the check shows that he desires to pay an honest

past-due debt. The person to whom he owed the debt is not hurt. He has the same past-due debt that he had before, but this now is a crime. His intent may be to meet the check or draft after it is given before presentation, and peradventure some emergency happens, sickness, deflation in business and many causes arise, that the deposit has not been made; he is a criminal for giving the check or draft, a criminal although honestly trying to pay by check or draft a past due debt he was not bound to give, but voluntarily did so wanting to pay. A person gives a note for a past due debt and he does not pay it at the maturity, although put in the bank, of course no law can make him a criminal. Here he gives a check or draft for a past due debt and has no deposit at the time, although intending to deposit when he makes a check or draft, yet he is a criminal.

Again, in practical experience it will clog and fetter business. The high ideal is that a person should so conduct his business and private life that it is an open book. The searchlight, although it should not, if turned on he has nothing to make him afraid or be ashamed of. One should be obedient to the law of his country, for it is law and orderly government. It is a matter of common knowledge that the eighty-five to ninety per cent of the volume of business is now done, not by cash, but by checks and drafts. The banks open in larger cities at 9 a.m., and close at 2 p.m., and in smaller towns they open at 9 and close at 3 o'clock. The last two banking hours are the heaviest receiving hours for deposit. Merchants and others get checks in the morning mail, or over the counter. These checks will be deposited later in the day; they are good, but he owes others and he cannot *"draw, make, utter or issue and deliver to another any check or draft,"* pay to any person present or send off to a creditor living away, as he knows at the time he hasn't sufficient funds on deposit in or credit with such bank to pay the check or drafts, but will have later in the day when he makes the deposit. Nor can he tell the creditor to hold the check until later in the day when he makes the deposit to meet it. It will paralyze the business man; he must obey the law. But was it made for him? It will catch those of the unfortunate class, but the law-abiding banker, business man, realtor, lawyer and others must obey the law and will be trapped in the meshes of this law, perhaps, set to catch others. No one can but admit it is an evil, but obedience to this law as written to the ordinary merchant and others, all of whom have but small deposits in the bank, will fetter the usual mode of legitimate business and tend to make honest law-abiding citizens criminals.

For example again (applicable to realtors and all sorts of business men): An attorney examines a title to land for one who borrows from

the building and loan, banker, or others, who loan on real estate. He finds that there are liens on the property. He must certify that the title is good, and he calls attention to the liens. The parties meet in the attorney's office. The check of the lender, perfectly good, is endorsed to the attorney to see that the liens are paid off. The person who has a mortgage or deed in trust receives a check from the attorney for his debt and the mortgagee or trustee goes over to the register of deeds' office and cancels the lien. The lien of the judgment creditors, laborers, materialmen and others, as the case may be, are paid by check. The attorney usually deposits between 1 and 2 o'clock the lender's check to meet these checks, understood by the parties to pay off the liens on the property. Every time he makes a check and delivers it, he is guilty of a crime. He must quit everything and deposit the lender's check before he can check out the money.

No post-dated check can be given, although absolutely in good faith. No friend can swap checks with another in an emergency, although in good faith.

The passing of a counterfeit coin is destructive of a governmental power. The Constitution of the United States, Art. I, sec. 8 "(5) to coin money. . . . (6) To provide for the punishment of counterfeiting the securities and current coin of the United States." A private check or draft has no similitude to the spurious coin.

It takes the strength of the imagination to conceive that a check is "clipped coin of the realm." The circulation of coin or securities is an inherent and constitutional governmental power. A check is a written order by a private person or corporation, payable usually to a certain person or order and drawn against a deposit of funds in a bank. It is not legal tender. *Ins. Co. v. Durham,* 190 N. C., p. 58. "Coin of the realm" or government securities is legal tender. A depositor is a creditor of the bank and the bank is the debtor. *Corporation Commission v. Trust Co.,* 193 N. C., 696.

The horrors of the debtor's prison has come down to us from ancient oppression; now this act changes the debtor's prison to the chain-gang, with hardened criminals, for a past-due debt, because a check is drawn and issued without fund on deposit or credit with the bank. The framers of the Constitution, to meet the wrong and nuisance of imprisonment for debt, said only in *case of fraud.* The courts are to become collecting agencies for bad debts.

Papers of Archibald D. Murphey, Vol. 2 (Hoyt), note p., 435 *et seq:* "In early time in North Carolina, as elsewhere, any debtor could be imprisoned at the pleasure of his creditor until the debt was paid."

In the History of the Supreme Court of North Carolina, 177 N. C., p. 621, written by *Chief Justice Walter Clark,* speaking to the subject of Judge Archibald D. Murphey, who by special commission sat on this Court: "Judge Murphey has always been very dear to the people of this State. He was the son of Colonel Archibald Murphey, a Revolutionary soldier of Caswell County. He was born in 1777 and graduated at the University of North Carolina with the highest distinction in 1799. From 1812 to 1818 by annual election he was Senator from Orange. *He has the originator of the system of internal improvements and common schools of this State.* He purposed to write a history of North Carolina. In 1818 he narrowly missed election to the Supreme Court, ·and was chosen to fill one of the vacancies on the Superior Court. His oration before the two literary societies of the University of North ·Carolina in 1827 was the first of a long series of these and has never been surpassed by any. *Under the common law barbarism of imprisonment for debt, this distinguished man, who reflects so much honor on his State, was for some months in Guilford jail, without any fault on his part.* He died in 1832." See Papers, *supra,* Vol. 2, p. 434, which says: "I apprehend that his too liberal theories were at the bottom of his private affairs, resulting in pecuniary embarrassment and ultimate failure—the end being his incarceration in Guilford jail. I never heard a breath against his integrity. His honor was unspotted. *He was the victim of a law inflicting torture as exquisite to the sensitive soul, if not to the body, as the rack or thumb-screws of the middle ages.*" (Italics mine.)

The evil Macaulay speaks of was counterfeiting or mutilating the silver money of the realm. Vol. 5, at p. 88, he says: "But the ignorant and helpless peasant was cruelly ground between one class which would give money only by tale and another which would take it only by weight." At p. 89: "In the midst of the public distress one class prospered greatly, the bankers." At p. 91: "But happily for England there were among her rulers some who clearly perceived that it was not by halters and branding irons that her decaying industry and commerce could be restored to health." The remedy (p. 101): "It was resolved that the money of the kingdom should be recoined according to the old standard both of weight and of fineness; that all the new pieces should be milled; that the loss of the clipped pieces should be borne by the public; that a time should be fixed after which no clipped money should pass except in payment to the government, and that a later time should be fixed after which no clipped money should pass at all." Then: "The advantages of this plan were doubtless great and obvious. It was most

simple, and at the same time most efficient. What searching, fining, branding, hanging, burning, had failed to do would be done in an instant."

In this case the lay authority is Goldsmith. The beauty of the philosophy of the life of the Vicar of Wakefield has seldom been excelled. When misfortune and the cunning and unscrupulous creditor had this Vicar imprisoned for debt, he says thus (p. 228): "And it were highly to be wished that legislative power would thus direct the law rather to reformation than severity. . . . (p. 230.) It were to be wished, then, that power, instead of contriving new laws to punish vice, instead of drawing hard the cords of society till a convulsion came to burst them, instead of cutting away wretches as useless, before we have tried their utility, instead of converting correction into vengence, it were to be wished that we tried the restrictive arts of government, and made law the protector, but not the tyrant of the people. We should then find that creatures whose souls are held as dross, only wanted the hand of a refiner; we should then find that wretches, now stuck up for long tortures, lest luxury should feel a momentary pang, might, if properly treated, serve to sinew the State in times of danger; that as their faces are like ours, their hearts are so too; that few minds are so base, as that perseverance cannot amend."